A99A1507. ENCHANTED VALLEY RV PARK RESORT, LTD. et al.
v. WEESE et al.
(526 SE2d 124)

ELDRIDGE, Judge.

Mike & Mike, Inc. created and owned a recreational development in Towns County, Georgia, for sale or rent as recreational vehicle sites. Robert N. Clay became the majority shareholder and changed the corporate name to Enchanted Valley RV Park Resort, Ltd. ("Developer"), appellant-defendant. On June 1, 1993, the Developer created Enchanted Valley Property Owners Association, Inc. ("Association"). At the time of creation of the Association, bylaws were adopted by the Developer without the participation of lot owners. Previously, on November 22, 1989, a Declaration of Covenants, Conditions, and Restrictions ("CCR") for The Pasture Recreational Vehicle Park and the unadopted bylaws were recorded with the Clerk of the Superior Court, Towns County as the governing documents of the Association. Some 39 separate items of documentary evidence, including these documents, were admitted at trial but were not included in the record on appeal.

In the summer of 1996, lot owners became dissatisfied with the Developer over its statement of an annual maintenance fee, including charges for water and sewer. In the spring of 1997, Leonard Scott, then President of the Association, resigned from the board of direc-

tors of the Association, and the board appointed Bob Ellis as the interim President, leaving S. Sandra Hutchinson as Association Secretary and Director. Hutchinson was a lot owner and resident managerial employee of the Developer.

In early September 1997, the Association's annual meeting was held, with Ellis presiding. At the time for election of board members, Ellis recognized only one vote per lot owner, regardless of the number of lots owned. Clay and Hutchinson did not recognize the validity of such election. After the meeting, Ellis, acting for the board, notified Hutchinson that she had been terminated as Secretary of the Association and that she should turn over all Association records, which she refused to do on Clay's instructions.

On December 6, 1997, the Association held a special meeting to elect new Directors for 1998. Clay disputed the election results on the basis that the bylaws were not followed and that there was no validation of the proxies, which were tabulated in determining the election results. The Developer owned 92 lots and claimed the right to cast 184 votes. Lot owners Steve Weese, David Wilson, and Jack Anderson were elected President, Vice-President, and Secretary/Treasurer and members of the board of directors of the Association ("Officers").

On March 26, 1998, the Officers sued the Developer, Clay, and Hutchinson for an accounting and to obtain the financial books, accounts, and records of the Association so that they could determine the Association members' assessment and pay the Developer proper fees and charges. They also sought to restrain the Developer from collecting its "Park Management Budget" from the Association and its members, which included water and sewer charges. The Developer and the other defendants answered and counterclaimed, seeking dissolution of a restraining order against Clay in Civil Action File No. 96-C.V.-0096-HS, to allow the Developer to collect service charges, including water and sewer; to disconnect services for failure to pay; and to declare the Association election void.

On August 12, 1998, after a four-day bench trial, the trial court entered its final order and judgment, which granted the Officers relief by setting the amount to be paid for water and sewer services for each lot, ordering the surrender of the Association's financial records, and validating the election. The defendants moved for a new trial. The trial court denied the motion. The defendants filed their notice of appeal. On December 14, 1998, the trial court granted a supersedeas that denied the defendants the right to sue to collect maintenance fees and charges for water and sewer or from terminating such services for non-payment. *Held*:

1. In their first enumeration of error, the defendants contend that the trial court erred in failing to grant the motion to dismiss. We do not agree.

The defendants contend that the December 6, 1997 election was not in compliance with the bylaws. However, neither the bylaws nor copies of other documentary evidence were sent to this Court as part of the record from the court below.

(a) The trial court had the bylaws in evidence and took judicial notice of Civil Action File No. 97-C.V.-061-HS; in Civil Action File No. 97-C.V.-061-HS the trial court determined that the recorded CCR bound all property owners and gave one vote to each lot owner. Such judgment was affirmed by this Court in *Enchanted Valley RV Park Resort v. Enchanted Valley Homeowners Assn.*, 232 Ga. App. XXVII (1998). Thus, the doctrine of res judicata prohibits the relitigation of the one lot/one vote issue.

(b) The defendants sought to assert the rights to two votes per lot under bylaws created at the time the Association came into existence long after the sale of lots and the CCR. The Association, however, received corporate status after the filing of the declaration. Such bylaws conflicted with the CCR, because the CCR gave only one vote per lot owner. The provisions under the CCR control, because the one vote/one lot created a vested legal right. See OCGA §§ 14-3-206 (b); 44-3-100 (a).

(c) The vote by the Association members by proxy had authorization under OCGA § 14-3-724. Either the corporate secretary or other officer had authority to receive and to tabulate votes, and the record showed evidence that an officer received such proxies for the December 6 election. OCGA § 14-3-724 (c). Since there existed a legitimate issue as to who was the Secretary, then another officer properly received and counted the votes. The votes of December 6 determined the members of the board of directors of the Association. Those directors properly appointed new officers to terms commencing January 1, 1998.

"The burden is on him who asserts error to show it affirmatively by the record." (Citations and punctuation omitted.) *Hancock v. Oates*, 244 Ga. 175, 176 (259 SE2d 437) (1979). "This cannot be done by evidentiary assertions in either the enumeration or the brief. [Cit.]" *Thigpen v. Johnson*, 169 Ga. App. 410, 411 (313 SE2d 121) (1984).

> It is well established that the burden is on the party alleging error to show it by the record and that where the proof necessary for determination of the issues on appeal is omitted from the record, an appellate court must assume that the judgment below was correct and affirm.

(Citations omitted.) *Bennett v. Exec. Benefits*, 210 Ga. App. 429 (436 SE2d 544) (1993). Therefore, this Court affirms the trial court's find-

ing that the election was valid.

2. Defendants contend that the trial court erred in finding that the Developer was a water authority under the rules and regulations of the Georgia Department of Natural Resources ("DNR"), subjecting it to a trust indenture for the continued operation and maintenance of the water and sewer systems. We do not agree.

> This Court[, Superior Court of Towns County], in Towns County Superior Court Civil Action No. 97-CV-061-HS, has previously ruled . . . that, under the CCR, annual assessments made against the lot owners, for water, sewer, and maintenance charges should be levied by and paid to the Association. Further, this Court found that, under the CCR, Resort Ltd. [(Developer)] owns the water and sewer systems serving the lots and is the exclusive source for such services.

Such issues were previously litigated between the parties and are subject to res judicata and collateral estoppel in this action, as found by the trial court. OCGA §§ 9-12-40; 9-12-42; *Gilmer v. Porterfield*, 233 Ga. 671 (212 SE2d 842) (1975); *Fierer v. Ashe*, 147 Ga. App. 446 (249 SE2d 270) (1978).

Based upon such previously adjudicated issues, the trial court made certain legal determinations as a matter of law, as well as certain additional findings of fact:

> (1) that "[t]he [Developer] has been approved by the Georgia Department of Natural Resources (DNR) to furnish water to 224 lots"; (2) that "[n]o trust indenture exists for the continued operation and maintenance of the systems"; (3) that "in addition to reimbursement to all water and sewer maintenance expenses, [Developer] was paid $25,531.34 (over-half of the total assessments collected) as a water and sewer fee"; (4) that "[t]he water and sewer systems for the Park are designed for service to RV users and not for full time residential service. The RV owners cannot have regular flush toilets but must use marine toilets. The owners may not have dishwashers or clothes washers in their units"; (5) that "[t]he Developer is currently seeking to have the Association assess $21.00 per month, per lot, as a water and sewer fee"; (6) that "[u]nder the law of this State . . . each lot owner has a quasi-easement for the provision of water and sewer services to their lots"; (7) that "[t]he Developer, or its successor or assigns, is entitled to receive 'reasonable' value' for the water and sewer services supplied"; and (8) that "pursuant to Georgia Department of Human Resources regulations

290-5-26.-.03, it is the Developer's responsibility to maintain and operate the on-site sewer management system in a safe and sanitary manner so as not to constitute a public health hazard or nuisance"; (9) that "[t]he Developer is operating a non-governmentally owned community public water system as defined in Georgia Department of Natural Resources regulations 391-3-5-.01 (66)"; and (10) that "[t]he Developer must comply with DNR regulations 391-3-5-.04 (4), and file with DNR an executed Trust Indenture as required therein, to assure the continuity and maintenance of the water system."

(a) Defendants contend that the rules and regulations of the Georgia Department of Human Resources ("DHR") were never tendered into evidence so that the trial court had nothing before it regarding such regulations. However, a trial court must take judicial notice of the rules and regulations of the State of Georgia that are published under authority by the Secretary of State. OCGA § 24-1-4. Pursuant to the Administrative Procedure Act ("APA"), the Georgia DHR Public Health Division and the Georgia DNR Environmental Protection Division must promulgate all of their rules and regulations as prescribed by said Act. OCGA §§ 50-13-2 (1), (6); 50-13-3; see also *Orkin Exterminating Co. v. Blackmon*, 229 Ga. 146, 149 (5) (190 SE2d 43) (1972). All such rules and regulations must be published by the Secretary of State as the Rules and Regulations of the State of Georgia. OCGA §§ 50-13-3 (b); 50-13-5; 50-13-7. Therefore, such rules and regulations were published by the Secretary of State under statutory authority within the meaning of OCGA § 24-1-4. Judicial notice of the rules and regulations promulgated under the APA and published under authority must be taken by the trial court. OCGA §§ 24-1-4; 50-13-8; *Owens v. Ga. Underwriting Assn.*, 223 Ga. App. 29, 32 (3) (476 SE2d 810) (1996); *Blossman Gas Co. v. Williams*, 189 Ga. App. 195, 200-201 (5) (375 SE2d 117) (1988); *Cullers v. Home Credit Co.*, 130 Ga. App. 441, 443 (3) (203 SE2d 544) (1973).

The trial court took judicial notice of controlling published regulations of the state as any other state law. See Rules & Regulations of the State of Georgia, Rules of the DHR Public Health Division, Chapter 290-5-26, On-Site Sewage Management Systems, § 290-5-26.-.03, pp. 685-689; Rules & Regulations of the State of Georgia, DNR Environmental Protection Division, Chapter 391-3-5, Rules for Safe Drinking Water, §§ 391-3-5.01 (66), 391-3-5-.04 (4), pp. 608.01, 608.07. Thus, the trial court did have in evidence before the court such rules and regulations.

(b) In prior litigation between the parties, the trial court determined that neither water nor sewage treatment was available to the lot owners in the park (The Pasture). The Developer maintained and

owned a community sewage treatment system within the rules and regulations of the DHR. Rules & Regulations of the State of Georgia, § 290-5-26.-.03, pp. 685-689.

> "Public water system or PWS" means a system that provides water to the public for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves an average of twenty-five (25) individuals daily at least 60 days out of the year.

Rules & Regulations of the State of Georgia, § 391-3-5-.01 (66), pp. 608.01-608.02. "A public water system is either a 'community water system,' a 'non-transient non-community water system,' or a 'transient non-community water system.' " Id. The Developer owned and maintained a public water system within the rules and regulations of the DNR.

Under the regulations of the DNR Environmental Protection Division, operation of a community public water system, provides that

> [t]he requirements of this paragraph shall apply to all non-governmentally owned community public water systems that have been issued a permit to operate by the Director or have applied for a permit before January 1, 1998. To assure the continuity of operation and maintenance of a non-governmentally owned and operated public water system when the water customers own the property being served by the supplier, the supplier of the water system shall file with the Division an executed Trust Indenture as prescribed by the Division and approved by the Director. The Trustee should preferably be a governmental authority. When a governmental authority is not available, the Trustee should be a property owners association organized to guarantee the operation and maintenance of the public water system. The association must be made up of members who are owners of properties served by the water system. The Articles of Incorporation and By-Laws of the association are to be submitted to the Division for review and/or approval. If a Trustee other than a unit of local government or property owners association is proposed, it will be necessary to determine that there is no identity-of-interest between the owner or the system and the Trustee. For new or proposed systems, the legal documents shall be submitted with the plans and specifications. When the supplier is or desires to serve water to property

[not] individually owned by the water consumer, a legal document assuring the continuity and maintenance of operation may not be required.

Rules & Regulations of the State of Georgia, § 391-3-5-.04 (4). The Developer is not in compliance with such requirement.

Clearly under the facts of this case, the Developer is a non-governmentally owned community public water system, i.e., a "water authority" in the defendants' words, and is subject to a trust indenture to assure continuity and maintenance of such system under DNR regulations §§ 391-3-5-.01 (66) and 391-3-5-.04 (4). The evidence is that there are 224 lots, of which 97 are rental lots owned by the Developer and Clay, and 137 are lots owned by others. The DNR regulations require a public water system to have at least 15 service connections or regularly serve an average of 25 individuals daily at least 60 days out of the year; both of these conditions were satisfied by the Developer. DNR regulations § 391-3-5-.01 (66). Several lot owners testified that they lived in the park most of the year.

In determining who was responsible for maintenance and upkeep of the non-governmentally owned public community water system and who was obligated to pay for water and sewage, it was necessary for the trial court to look to all applicable state and federal laws, as well as applicable rules and regulations of the agencies of government. As officers/directors of the Association of owners of lots served by the public water system, the plaintiffs had standing to raise such issues on behalf of the Association.

3. In other litigation between the parties over some of the same issues, defendants sought to establish what the developers' financial obligations to the homeowners association were. This earlier litigation was *Enchanted Valley RV Resort, Ltd. v. Jones*, Civil Action File No. 93-C.V.-150-HS, Towns Superior Court, which involved the same parties but different issues from the prior action mentioned in Divisions 1 and 2.

Defendants assert that the trial court erred in finding that the Developer failed to pay the full amount for water, sewer, and maintenance fees, because such issue was controlled by the judgment in *Enchanted Valley RV Resort, Ltd. v. Jones*, Civil Action File No. 93-C.V.-150-HS, Towns Superior Court.

The defendants did not tender into evidence a certified copy of Civil Action File No. 93-C.V.-150-HS, which is a different case from that mentioned in Divisions 1 and 2 and which defendants relied upon for collateral estoppel or res judicata; nor did they request at trial that the trial court take judicial notice of such prior suit between the parties in the same court. If such case was ever tendered

into evidence, then defendants failed to include it as part of the record on appeal. The defendants do not cite to the record where such evidence exists. See Court of Appeals Rule 27 (c) (3) (i).

Absent evidence of the prior pleadings and judgment in such related case and citation to the record, this Court cannot determine if the doctrine of res judicata applies to this case. Rule 27 (c) (3) (i) requires the appellants to support their assertion of error "by specific reference to the record or transcript. In the absence of such reference, the Court will not search for or consider such enumeration." See also *Darnell v. Houston County Bd. of Ed.*, 234 Ga. App. 488, 491 (2) (506 SE2d 385) (1998); *Diffley v. Marshall's at East Lake*, 227 Ga. App. 343, 345 (489 SE2d 123) (1997). "It is well-settled that an appellate court will not cull the record in search of error on behalf of one of the parties." (Citations and punctuation omitted.) *Bates v. Guaranty Nat. Ins. Co.*, 223 Ga. App. 11, 15 (2) (476 SE2d 797) (1996). In this case, defendants "failed to sustain [their] evidentiary burden of showing harm by providing specific citations to the record. *Diffley v. Marshall's,* [supra at 345]." *Darnell v. Houston County Bd. of Ed.*, supra at 491. Thus, this enumeration is deemed abandoned.

4. Defendants contend that the trial court erred in finding that the Developer was the only source of water and sewer services. However, such issues previously have been adjudicated between the parties in prior litigation as set forth in Division 2, which controls.

5. The defendants contend that the trial court erred in finding that there was an inappropriate commingling of funds between the Developer and the Association. We do not agree.

The plaintiffs, in their capacity as newly elected officers of the Association, sought equitable relief to obtain an accounting from Clay, Hutchinson, and the Developer of the funds and financial records of the Association and to compel by injunction that the books and records be turned over to them. Where a fiduciary commingles assets and records for its benefit, such provides grounds for equity to act. See *Perkins v. First Nat. Bank of Atlanta*, 221 Ga. 82, 88 (2) (143 SE2d 474) (1965); *Perdue v. McKenzie*, 194 Ga. 356, 366-370 (3) (21 SE2d 705) (1942); *McCord v. Walton*, 192 Ga. 279 (1) (14 SE2d 723) (1941). One acting as agent, corporate officer, trustee, receiver, executor, or administrator has an imperative duty of an accounting party to keep his accounts in a regular manner and to be always ready with his accounts. He is bound to render all necessary information required of him. See *Poullain v. Poullain*, 76 Ga. 420, 446 (5) (4 SE 92) (1886).

Prior to 1997, defendants controlled the Association and assessed lot owners fees payable to the Association. Hutchinson worked for the Developer and the Association without distinction between the two corporate entities.

A corporate officer or director owes to the corporation and its stockholders a fiduciary or quasi-fiduciary duty, which requires that they act in utmost good faith. " 'Directors and officers in the management and use of corporate property in which they act as fiduciaries and are trustees are charged with serving the interests of the corporation as well as the stockholders.' " (Citations and punctuation omitted.) *Pelletier v. Schultz*, 157 Ga. App. 64, 66 (3) (b) (276 SE2d 118) (1981). When such duties are violated, resulting in waste to the corporate assets or injury to such property, the directors and managers are liable to account. Id.; see *Phoenix Airline Svcs. v. Metro Airlines*, 260 Ga. 584, 585-586 (1) (397 SE2d 699) (1990); *Caswell v. Jordan*, 184 Ga. App. 755, 760 (7) (362 SE2d 769) (1987). With a nonprofit corporation, the officers and directors owe their fiduciary duties to the corporation, unless they cause individual injury to an association member by the breach of their fiduciary duties. *Dunn v. Ceccarelli*, 227 Ga. App. 505, 507-508 (1) (489 SE2d 563) (1997). Thus, Hutchinson, as an officer and director, was subject to an equitable accounting of the assets of the Association, which involved Clay and the Developer because they had commingled their funds with those of the Association.

The trial court found that Clay has treated himself as the Developer, i.e., Enchanted Valley RV Park Resort, Ltd., the Association, or the Park, and made no distinction between any of them. According to the trial court, "Clay has provided management services to the Park, for a fee, including services for Resort Ltd. and the Association and for individual lot owners, without differentiating between the entities or the respective entities or the respective services provided." Also, "Clay/Resort Ltd. (hereinafter jointly referred to as 'the Developer') has charged lot owners, through the Association, a monthly fee for water and sewer services." The trial court also found:

In 1997 Hutchinson was in control, under the direction of Clay, of the Association receipts and expenditures, as well as Resort Ltd.'s receipts and expenditures. During that time Hutchinson was an employee of Resort Ltd. and an officer and director of both Resort Ltd. and the Association. The financial records placed in evidence, and the testimony of Hutchinson and Clay show an extensive commingling of funds belonging to Resort Ltd. and to the Association. The Association's funds were used to pay the Developer's employee's salaries, its telephone and utility charges, its property taxes, its civic association dues, its office expenses and other expenses of the Developer's business of selling and renting lots. Neither Clay nor Hutchinson could separate out the charges which may have pertained to the business of

the Association and those of the Developer. Both Clay and Hutchinson considered the expenses of the Association and the expenses of the Developer to be the singular expenses of the Park. The Developer alleges he/it has paid his 1998 fees to the Association account under the control of Hutchinson, together with fees collected from Clay's employees and relatives who are also lot owners. Out of the 1998 fees collected by Hutchinson, on behalf of the Association, she has paid out the Developer's business expenses, employee's salaries, the Developer's bank interest payments, insurance costs, utilities, and some minor maintenance costs for "common areas." During 1998 the Developer deposited over $67,700.00 into the Association account, and then withdrew that same amount from that account, as a "bookkeeping entry." Due to the extensive commingling of funds and disregard of the separate nature of the Association and the Developer in the accounts maintained and controlled by the Defendants, the Court cannot determine how much of the Association's funds were properly applied to the Association expenses.

Notwithstanding that Clay may have found it necessary for the Developer to make two loans to the Association, such evidence neither explained nor justified Clay and the Developer commingling funds and treating the Association as an alter ego, from which accounts they paid their non-Association debts. Such loans should have been treated at arm's length like any other business loan with notes as evidence of indebtedness and a formal payment schedule to reduce the debt. Such issue regarding the mishandling of funds was relevant and material in the trial court's findings as to why Hutchinson was terminated as Secretary of the Association for ignoring the corporate entities; why the Developer through the Association could not set fees and maintenance charges; impose fees and collect them; why it was impossible to determine what Association fees Clay and the Developer had paid; why it was impossible for the trial court to determine what funds belonged to the Association and to the Developer in the Association accounts; why it was impossible to determine what, if anything more, the Association owed to the Developer; and why the Developer's financial claims could not be collected by suit or termination of services under the supersedeas order.

Defendants systematically "disregarded the separateness of legal entities[, i.e., Developer and Association,] by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." *Earnest v. Merck*, 183 Ga. App. 271, 273 (358 SE2d 661) (1987); accord *Amason v. Whitehead*, 186 Ga. App. 320, 322 (367 SE2d 107) (1988); *Northwest Preferred v. Wil-*

*liams*, 184 Ga. App. 145, 147 (2) (360 SE2d 910) (1987). Thus, the trial court did not err.

6. The defendants contend that the trial court erred in setting $120 per lot per year as the water and sewer charge for the Association to pay to the Developer. We do not agree.

The public water system was designed and restricted to RV use only and was not for full-time residential service. Express limitations were set by the Developer and the County Health Department, i.e., no flush toilets, only marine toilets, no dishwashers, and no clothes washers. Therefore, water consumption was limited to cooking and bathing.

When the Developer began the Park, he charged lot owners $200 per lot per year for water, sewer, and use of the other amenities. Service and maintenance costs on the systems were assessed separately. The fee for water and sewer in the past has varied between $12 and $15 per lot per month or $144 and $180 annually per lot. In 1997, all lots other than the Developer's were assessed for water and sewer totaling $25,531.84, which represented $122 per lot. In 1998, the Developer sought to charge $21 per lot per month for water and sewer. From the evidence the trial court determined as a matter of equity that a reasonable value for water and sewer per month per lot was $12 for the easement of use. See *Rowland v. Woods*, 259 Ga. 832, 834 (3) (388 SE2d 684) (1990). In calculating what was a fair and equitable charge for the quasi-easement for the water and sewer systems, the trial court looked to evidence as to what the Developer had accepted in the past for such services. *Smallwood v. Conner*, 118 Ga. App. 59 (162 SE2d 747) (1968). In making such calculations, the trial court looked also to the type of utility systems involved, the use limitations, authorized number, potential number of users within the authorization, historical maintenance costs, and the obligation to maintain the systems. Since there was evidence to support the findings of the trial court, appellate courts on review should not disturb such findings. *Adams v. Crowell*, 157 Ga. App. 576 (278 SE2d 151) (1981); *Collins v. Brayson Supply Co.*, 157 Ga. App. 438 (278 SE2d 87) (1981).

*Judgment affirmed. Pope, P. J., and Smith, J., concur.*

DECIDED NOVEMBER 23, 1999 —
RECONSIDERATION DENIED DECEMBER 14, 1999 — ■

*Chamberlain, Hrdlicka, White, Williams & Martin, Richard N.*

*Hubert*, for appellants.
   *Sorgen & Schindelar, Lawrence S. Sorgen*, for appellees.