**THIRD DIVISION**
**DOYLE, P. J.,**
**MARKLE and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**December 18, 2025**

# In the Court of Appeals of Georgia

A25A1543. RAMEY v. KIMSEY et al.

DOYLE, Presiding Judge.

Raymond and Maria Kimsey filed the instant suit for trespass and ejectment against Horace Ramey, and after a bifurcated trial, the jury awarded them $27,000 in general damages and $450,000 in punitive damages, which the trial court reduced to $250,000 pursuant to OCGA § 51-12-5.1(g). The trial court denied Ramey's motion for new trial, and he now appeals, arguing that the punitive damages award was grossly excessive. For the reasons that follow, we affirm.

Viewed in the light most favorable to the verdict, see *Paine v. Nations*, 283 Ga. App. 167, 167–68 (641 SE2d 180) (2006), the record shows that the Kimseys and Ramey owned adjacent properties in Rabun County, Georgia, separated by a creek.

The Kimseys' property went to the creek's centerline and encompassed half of a waterfall. The other half of the waterfall was owned by adjoining landowners who are not parties to this litigation.

In 2004, Ramey and other family members purchased the property he now owns. There are seven homes on the property, with the earliest originally built as an orphanage in 1910. The orphanage building was converted to a bed and breakfast prior to Ramey's purchase, and the other buildings, including a house near the creek ("the creek house"), were used as long-term rentals until 2018, when Ramey converted to short-term rental. Near the creek house, a foot bridge spanned the creek leading to a clearing surrounded by thicker woods. The bridge predated Ramey's purchase of the property, and he assumed it belonged to him because it was painted the same color as the creek house.

In 2014, the Kimseys inherited their main property from family, who had owned it since the 1960s, and this property included half the creek and waterfall. Although Raymond's parents lived on the property full time, he mainly used it as a vacation home, until Maria moved there more recently. Across the creek from this original property were other landowners. Around 2017, the Kimseys purchased an adjacent lot

("the Ritter property"), which also abutted the creek below the original property. Across the creek from the Ritter property was Ramey's property, and this is where the foot bridge was located.

Around 2018, the Kimseys noticed that the clearing on the former Ritter property contained chairs and a firepit. Raymond conceded that the bridge existed when he purchased the Ritter property, but he claimed that more clearing had occurred and the chairs and the firepit were new. The Kimseys moved the chairs onto Ramey's side of the bridge, but the chairs reappeared in the clearing; they did not know who moved them back. Raymond also removed the firepit, which was not replaced.

Raymond also testified that around 2015, Ramey cleared a path by the creek on his own property by the creek up and across another owner's land by the creek to the area with the waterfall (opposite of the Kimseys' side). The Kimseys added "no trespassing" signs to their side of the creek, and they added more when they discovered the clearing across from the bridge. Those signs were removed frequently, but the Kimseys could not determine who removed them.

Around 2021, the Kimseys saw a short-term rental listing for Ramey's property that included pictures of the waterfall even though his property did not include any portion of that location. Their finding coincided with an increase in visitors to the waterfall, and the Kimseys found these visitors to be more persistent and confrontational when asked to leave the property as compared to previous visitors they had encountered there and had assumed were locals. The Kimseys also found garbage on their side of the creek, which they attributed to Ramey, his workers, and short-term rental guests, but they conceded that they did not actually see anyone discard any trash or construction debris.

These intrusions onto their property led the Kimseys to file the instant suit in 2022, alleging trespass and requesting ejectment, an injunction, damages, and punitive damages.

At trial, Ramey conceded that he used the bridge and the clearing just across the bridge, adding the firepit and chairs. After this litigation began, Ramey stopped using the area across from the bridge, and he later paid to remove the foot bridge. As for the path to the waterfall, he testified that it preexisted any work he did and was maintained by visitors (not necessarily his guests) who walked to the waterfall on his side of the

4

creek. He denied telling his guests to go to the Kimseys' side of the creek at the waterfall and denied leaving any piles of trash or debris of any kind on the Kimseys' side.

Ramey's rental manager worked at the property in the 1980s and 1990s and testified that the bridge was over the creek at least by 1998. She admitted that she posted pictures of the waterfall on the rental website and told guests how to get there, but she also stated many visitors went to the waterfall on Ramey's side of the creek even if they were not renting a unit from Ramey. She denied telling the guests to walk to the waterfall on the Kimseys' property.

After deliberation, the jury first returned a verdict against Ramey in the amount of $27,000 general damages, awarding no nominal or special damages or attorney fees. The jury also indicated on the special form that it wished to award punitive damages. Separately, the trial court issued an injunction prohibiting Ramey or his guests or invitees from entering the Kimseys' property.

After the punitive damages phase, the jury awarded the Kimseys $450,000 in punitive damages but found on the second special verdict form that Ramey did not act with specific intent to harm them. Based on that finding, the trial court reduced the

punitive damages award to $250,000 as required by the award limitation set forth in OCGA § 51-12-5.1(g). Ramsey moved for new trial of the award, which the trial court denied.

Ramey now appeals, arguing in a single enumeration of error that the trial court erred by denying his motion for new trial on the basis that the punitive damages award was grossly excessive or disproportionate to the general damages awarded by the jury.

As an initial matter, the trial exhibits do not appear in the appellate record. To the extent that any omission has hampered our review to Ramey's detriment, he "'bore the burden of ensuring an accurate and complete record on appeal' so that this Court could objectively and fully review the trial court's ruling." *Gajaanan Inv., LLC v. Shahil & Sohail Corp. Inc.*, 323 Ga. App. 694, 698 (1) (747 SE2d 713) (2013) (quoting *Griffin Builders, LLC v. Synovus Bank*, 320 Ga. App. 307, 309 (739 SE2d 760) (2013)). "'It is well established that the burden is on the party alleging error to show it by the record and that where the proof necessary for determination of the issues on appeal is omitted from the record, an appellate court must assume that the judgment below was correct and affirm.'" *Enchanted Valley RV Park Resort, Ltd. v. Weese*, 241 Ga. App. 415, 417 (1) (c) (526 SE2d 124) (1999).

With regard to Ramey's substantive argument, punitive damages are authorized in tort actions "in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1(b). "A conscious indifference to consequences relates to an intentional disregard of the rights of another. Wilful and intentional misconduct is not essential. But a trespass is an intentional act. Thus, a wilful repetition of a trespass will authorize a claim for punitive damages." *Tyler v. Lincoln*, 272 Ga. 118, 120 (1) (527 SE2d 180) (2000) (citations, punctuation, and emphasis omitted).

When punitive damages are to be awarded, the trier of fact is to assess "evidence regarding what amount of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case." OCGA § 51-12-5.1(d)(2). Indeed, "punitive damages may be awarded even when actual damages are small." *Tyler*, 272 Ga. at 121 (1). Thus, "[t]he proper amount of punitive damages is based on the enlightened conscience of the trier of fact, and on appeal, an award will not be disturbed unless it is so excessive or inadequate as to shock the

judicial conscience to the degree that a judgment entered thereon constitutes an error of law." *Cotto Law Group, LLC v. Benevidez*, 362 Ga. App. 850, 858 (2) (870 SE2d 472) (2022) (citation modified). See also *Thakkar v. Parikh*, 375 Ga. App. 621, 630 (3) (d) (917 SE2d 193) (2025) (vacating $65,000,000 punitive damages award after addressing whether the award was grossly excessive in violation of "the Due Process Clause of the Fourteenth Amendment of the United States Constitution [or] Georgia law."); *Time Warner Ent. Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 599 (2) (a) (i) (563 SE2d 178) (2002) (addressing the proper standard of review of a challenge to a punitive damage award).

Ramey contends that the punitive damages award was not authorized in this amount or under the facts because the Kimseys could not say how many people trespassed on their side of the property, how frequently the trespassers came, or whether those people were actually connected to Ramey; the Kimseys did not observe where the trash or debris came from; and the injunction would be sufficient to prevent any further intrusion onto the Kimsey's side of the creek. He argues that the Kimseys admitted that people have always visited the waterfall, that Raymond admitted that it was a local resource, and that Ramey believed it was public. Citing *Lightning v.*

*Roadway Express, Inc.*, 60 F3d 1551, 1559 (IV) (E) (11th Cir. 1995), Ramey argues that this Court should apply the following test to determine whether the award was reasonable: whether "(1) the misconduct caused personal injury or merely damage to property; (2) the actor's misconduct was active or passive; and (3) a rational relationship exists between the misconduct and the amount of the award." Id. (citing See *Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 122 (5) (365 SE2d 827) (1988)).

Applying that test, we discern no reason to disturb the award. The evidence authorized the jury to find that Ramey's act of intentionally advertising access to the waterfall to his guests and his admission that he placed the chairs and firepit on the Kimsey's property constituted an "entire want of care which would raise the presumption of conscious indifference to consequences." See OCGA § 51-12-5.1(b); see also *Tyler*, 272 Ga. at 121 (1). In such cases, the General Assembly has determined that an award of up to $250,000 may be appropriate. See OCGA § 51-12-5.1(g).

In addition to his use of the Kimsey property for the firepit, Ramey admitted that his property line ended at the midline of the creek and that no part of the waterfall was on his property. Even if the other owners of the waterfall aside from the Kimseys were not party to the litigation, this is evidence of the knowing and repeated use of the

9

property of others. See *Teague v. York*, 203 Ga. App. 24, 25 (2) (416 SE2d 356) (1992) (affirming a punitive damage award because the evidence established repeated trespass onto the property of another). Moreover, there was evidence that Ramey profited off the trespasses given his advertisement of the waterfall in connection to his short-term rentals. Thus, the award, as reduced under OCGA § 15-12-5.1(g) and which was 9.25 times the general damages award, was rationally related to profit-driven nature of his acts, even if there was no evidence of potential personal injury. Although the injunction may be sufficient to prevent future incursion onto the Kimseys' property, deterrence of future behavior is only one aspect for awarding punitive damages. See OCGA § 51-12-5.1(c), (d)(2).

Given the record as a whole, we cannot say that the award, while high, was so excessive as to shock the judicial conscience. Accordingly, there was no error in either the punitive damages award or the trial court's denial of Ramey's motion for new trial as to that issue.

*Judgment affirmed. Markle and Padgett, JJ., concur.*