S13A0989, S13A1189, S13A1190. HASTY v. CASTLEBERRY
(three cases).
(749 SE2d 676)

MELTON, Justice.

In these consolidated cases, the Superior Court of Cherokee County granted partial summary judgment to Joan Hasty Castleberry ("Joan") and denied summary judgment to her brother, William G. Hasty, Jr. ("William"), with respect to Joan's claims regarding William's alleged mismanagement of trust assets as the trustee of a marital trust and with respect to William's alleged collection of excessive executor's fees as the executor of their parents' respective estates. For the reasons set forth below, we affirm in part and reverse in part the trial court's grant of partial summary judgment to Joan.[1]

The record reveals that William G. Hasty, Sr. ("Mr. Hasty"), died in November 2003, leaving a gross estate of over $10 million ("Mr. Hasty's Estate" or the "Estate"). His will (the "Will") directed most of the Estate assets into a marital trust (the "Marital Trust") for the lifetime support of his wife, Hazel Wyatt Hasty ("Mrs. Hasty"), and the remainder to his three children: Dixie Kinard, William, and Joan. William was named Executor of the Estate and Trustee of the Marital Trust. The Marital Trust was valued initially at over $6 million, a large portion of which included almost 85,000 shares of Wachovia Bank common stock. Although the stock's value decreased precipitously over time, William, as Trustee of the Marital Trust, kept the stock as a Trust asset. The Will directed the Trustee to pay all Marital Trust income for the exclusive benefit of Mrs. Hasty and to encroach upon the principal of the Marital Trust for Mrs. Hasty's support if the Trustee determined that the income being paid to Mrs. Hasty would

---

[1] In Case No. S13A0989, William appeals from the trial court's decision in his capacity as trustee of the marital trust. In Case Nos. S13A1189 and S13A1190, William appeals from the trial court's decision in his capacity as executor of his parents' respective estates. Because the briefs are identical in all three cases, and because all of the cases involve the same trial court order, all three cases will be addressed simultaneously for purposes of this opinion.

be insufficient to provide for her "proper support [or] maintenance, or to enable her to meet any difficulty produced by sickness, accident, or similar cause."

Mrs. Hasty fell ill in 2005, and she required continuous care. Fearing that his mother could die at any time, William consulted with accountants in order to find ways to protect the assets in his mother's estate from estate taxes in the event that she died, including assets from the Marital Trust. Despite William's concerns about his mother's imminent demise, Mrs. Hasty did not pass away until 2009. Although William already served as Executor of Mr. Hasty's Estate and Trustee of the Marital Trust, he was also appointed as Executor of Mrs. Hasty's Estate.

While his mother was ill, William was a member of Reinhardt University's Board of Trustees, and at one time had served as the Board's secretary. During his tenure on the Board, William was asked to serve as co-chair of Reinhardt's Capital Campaign Committee and to make a substantial gift to the university in support of the Campaign. In order to make the gift, and, by William's explanation, in order to protect the assets in his mother's future estate in the event that she died from her illness, on May 18, 2005, William had Mrs. Hasty sign a power of attorney authorizing him to make a charitable gift to Reinhardt on her behalf.[2] On May 20, 2005, William borrowed $1 million from Southern National Bank (now United Community Bank) in his capacity as Trustee of the Marital Trust and secured the loan by using as collateral part of the Wachovia stock that was included in the Marital Trust. He then removed $1 million from the Marital Trust and purported to loan that $1 million to Mrs. Hasty, so that the $1 million gift to Reinhardt University could be completed on Mrs. Hasty's behalf (through William's power of attorney) in four installments over four years.

On May 3, 2011, Joan filed suit against William, seeking damages for William's alleged breach of fiduciary duty for making the Reinhardt transfer, his alleged mismanagement of Trust investments, and his alleged collection of excessive executor's fees. William denied any wrongdoing, and he also filed a cross-motion for summary judgment, contending that Joan was barred from bringing her claims based on the applicable statute of limitations and the equitable doctrines of unclean hands, laches, and estoppel. The trial court granted partial summary judgment to Joan on the breach of fiduciary duty claim, finding that William both abused his power and acted

---

[2] William also claims that he collected various executor's fees from his father's Estate in order to shield certain Estate assets from potential future estate tax liability for his mother.

under a conflict of interest regarding the Reinhardt transfer, and denied summary judgment to William on all issues. The trial court also found that questions of fact existed as to William's breach of his duty to properly manage the Trust investments and as to damages sustained by Joan resulting from William's breach of his fiduciary duty with respect to the Reinhardt transfer. In addition, the trial court found that issues of fact existed regarding the extent to which William may have collected excessive executor's fees.

1. William contends that, because this case involves trust administration, and because "[t]rusts are peculiarly subjects of equity jurisdiction" (OCGA § 53-12-6 (a)), he is automatically entitled to invoke the equitable defenses of unclean hands, laches, and estoppel to shield himself from potential liability with respect to the legal claims asserted against him by Joan. We disagree.

Not all cases involving the administration of trusts are considered to be equitable in nature. See OCGA § 53-12-6 (a) ("Suits by or against a trustee which sound at law may be filed in a court of law"). See also, e.g., *Durham v. Durham*, 291 Ga. 231 (728 SE2d 627) (2012) (For purposes of an appeal, it is the primary issue raised, and not the mere fact that the administration of a trust is involved, that determines whether the case is an equity case or an action at law). Here, Joan filed an action at law against William seeking only money damages. Because this is an action at law, the equitable defenses of laches and unclean hands have no application here. *Marsh v. Clarke County School Dist.*, 292 Ga. 28, 29-30 (732 SE2d 443) (2012) ("[I]nasmuch as laches is an equitable defense, it cannot be applied to actions at law."); *Holmes v. Henderson*, 274 Ga. 8, 8-9 (1) (549 SE2d 81) (2001) ("The equitable doctrine of unclean hands . . . has no application to an action at law") (footnote omitted). William's arguments to the contrary are unpersuasive.

On the other hand, equitable estoppel may be applied as a defense in an action at law. See, e.g., *Robinson v. Boyd*, 288 Ga. 53 (4) (701 SE2d 165) (2010). Nevertheless, the doctrine would not shield William from potential liability with respect to the claims asserted by Joan.

> In order for an equitable estoppel to arise, there shall generally be some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence as to amount to constructive fraud, by which another has been misled to his or her injury.

OCGA § 24-14-29. There is no evidence of record that Joan intentionally deceived William or somehow misled him to believe that she

wanted him to use money from the Marital Trust to execute the $1 million gift to Reinhardt. Nor is there any evidence that Joan was grossly negligent in some way that would amount to constructive fraud in relation to William's decision to execute the gift. We therefore affirm the trial court's ruling that William's attempt to rely on the equitable defenses of unclean hands, laches, and equitable estoppel fails.

2. William next contends that Joan failed to file her claim within the prescribed statute of limitations of OCGA § 53-12-307. We disagree.

OCGA § 53-12-307 (a) provides two different limitations periods with respect to actions against trustees. Where the beneficiary bringing a breach of trust claim against the trustee has

> received a written report that adequately discloses the existence of a claim against the trustee for a breach of trust, the claim shall be barred as to that beneficiary unless a proceeding to assert the claim is commenced within two years after receipt of the report. A report adequately discloses existence of a claim if it provides sufficient information so that the beneficiary knows of such claim or reasonably should have inquired into the existence of such claim. If[, on the other hand,] the beneficiary has not received a report which adequately discloses the existence of a claim against the trustee for a breach of trust, such claim shall be barred as to that beneficiary unless a proceeding to assert such claim is commenced within six years after the beneficiary discovered, or reasonably should have discovered, the subject of such claim.

Id. William contends that the two-year statute of limitations is applicable here, arguing that a letter that he received from his accountants, and which he showed to Joan, constituted a "written report" sufficient to trigger the running of the two-year statute of limitations upon Joan's receipt of it in late August 2005. William is incorrect.

Pursuant to OCGA § 53-12-307 (a), two things must occur in order for a beneficiary's breach of trust claim to become subject to the two-year, rather than six-year, statute of limitations: (1) the beneficiary must receive a "written report," and (2) that written report must "adequately disclose[ ] the existence of a claim [by] provid[ing] sufficient information so that the beneficiary knows of such claim or reasonably should have inquired into the existence of such claim." Id. If both of these requirements are not met, the beneficiary's claim may

be "commenced within six years after the beneficiary discovered, or reasonably should have discovered, the subject of [the] claim." Id. As explained more fully below, because the document that William provided to Joan did not constitute a "report" as required by OCGA § 53-12-307 (a), Joan's claim against William was subject to the six-year, rather than the two-year, statute of limitations.

As an initial matter, because the term "report" is not defined in OCGA § 53-12-307 (a), we must determine what type of written document would constitute a "report" as intended by the Legislature for purposes of OCGA § 53-12-307 (a). In order to do this,

> we apply the fundamental rules of statutory construction that require us to construe [the] statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage. At the same time, we must seek to effectuate the intent of the legislature.

(Citations omitted.) *Slakman v. Continental Cas. Co.*, 277 Ga. 189, 191 (587 SE2d 24) (2003). Where, as here, the term "report" is undefined and could have several meanings based on the manner in which it is used in OCGA § 53-12-307 (a), "it becomes necessary to give proper consideration to other related statutes in order to ascertain the legislative intent in reference to the whole system of laws of which [OCGA § 53-12-307 (a)] is a part." *DeKalb County v. J & A Pipeline Co.*, 263 Ga. 645, 648 (437 SE2d 327) (1993). In this connection, we must presume that OCGA § 53-12-307 (a) was

> enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. It is therefore to be construed in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and its meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts.

(Citations and punctuation omitted.) *Retention Alternatives, Ltd. v. Hayward*, 285 Ga. 437, 440 (2) (678 SE2d 877) (2009).

Although OCGA § 53-12-307 does not specify what would constitute a written "report," other portions of Georgia's Trust Code do define the term "report." Specifically, OCGA § 53-12-243, which is also a part of the Trust Code, requires a "report" from a trustee to a

beneficiary to include "the assets, liabilities, receipts, and disbursements of the trust, the acts of the trustee, and the particulars relating to the administration of the trust, including the trust provisions that describe or affect such beneficiary's interest." OCGA § 53-12-243 (a). Because the letter to William from his accountants was simply a form of general correspondence that did not contain the type of detailed information contemplated by the Legislature for it to qualify as a "report," the letter cannot be considered to be a "report" for purposes of the Trust Code. Therefore, Joan's cause of action against William was not subject to the two-year statute of limitations of OCGA § 53-12-307. Rather, the six-year statute of limitations would apply. The trial court was therefore correct in concluding that the six-year limitations period applied in this case.

Even if we assume that Joan knew about the close of the loan transaction involving the Trust at the moment that it was made on May 20, 2005, her cause of action was timely filed. See, e.g., *Mayfield v. Heiman*, 317 Ga. App. 322, 325 (1) (730 SE2d 685) (2012) (close of loan transaction was the alleged wrongful act that triggered running of the statute of limitations). Under such circumstances, the statute of limitations on Joan's cause of action against William would have begun to run on May 20, 2005, and, because Joan filed her lawsuit on May 3, 2011, her claim would still have been filed within the applicable six-year limitations period.[3] We therefore affirm the trial court's ruling that Joan's lawsuit against William was not time barred.

3. William asserts that the trial court erred in granting summary judgment to Joan on her claim that William breached his fiduciary duties by diverting $1 million from the Marital Trust to Reinhardt. We disagree.

It is undisputed that William removed $1 million from the Marital Trust, used assets from the Trust as collateral to secure a loan, deposited the $1 million into accounts registered to Mrs. Hasty, and authorized the transfer of the $1 million from Mrs. Hasty to Reinhardt University through a power of attorney that William had asked Mrs. Hasty to sign. As explained more fully below, because

---

[3] To the extent that Joan has asserted any claims against William that are specific to his role as Executor of their parents' Estates, and not in his role as Trustee of the Marital Trust, such claims would be subject to the ten-year statute of limitations applicable to actions against executors. See OCGA § 9-3-27 ("All actions against executors, administrators, or guardians, except on their bonds, shall be brought within ten years after the right of action accrues."). For example, Joan's claim that William collected excessive executor's fees with respect to the administration of his father's estate would be subject to the ten-year statute of limitations.

William's actions were not authorized under the terms of the controlling Trust documents, the trial court properly granted summary judgment to Joan.

As an initial matter, a trustee has a duty to administer a trust in accordance with its terms and purposes. OCGA § 53-12-241; see also Restatement (Third) of Trusts § 76 (2007) ("The trustee has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law."); Restatement (Third) of Trusts § 76, comment (c) (2007) ("A fundamental duty of the trustee is to carry out the directions of the testator or settlor as expressed in the terms of the trust"), quoting George Gleason Bogert, George Taylor Bogert & Amy Morris Hess, *The Law of Trusts and Trustees* § 541. Furthermore, with respect to remainder beneficiaries such as Joan, where, as here, the Trust involves "successive beneficiaries, that is[,] income to a beneficiary for life and the principal later to other beneficiaries . . . the trustee is under a duty so to administer the trust as to preserve a fair balance between [the life beneficiary and the remainder beneficiaries]." *Citizens & Southern Nat. Bank v. Haskins*, 254 Ga. 131, 140 (9) (327 SE2d 192) (1985). In other words, William was tasked with the duty of preserving a fair balance between using the Trust assets for Mrs. Hasty's support and maintenance during her lifetime while also making sure that the corpus of the trust would be preserved and protected for Joan and the other remainder beneficiaries. See, e.g., *SunTrust Bank v. Merritt*, 272 Ga. App. 485, 489 (1) (612 SE2d 818) (2005). Here, with respect to the Trustee's power to invest, lend, or borrow money, Mr. Hasty's Will granted William the power

> [t]o acquire, hold, dispose of, retain, invest and reinvest in as they see fit, any property of any nature whatsoever . . . whether or not authorized by law as a permitted investment for Executors and Trustees, and any investment made or retained by them in good faith and with reasonable prudence shall be proper, although of a kind or in an amount or proportion not authorized by law as suitable for Trustees and Executors.

However, the Will further stated that

> [w]henever in the sole judgment of my Trustee *the income being paid to my wife . . . shall be insufficient for her proper support, maintenance, or to enable her to meet any difficulty*

> *produced by sickness, accident, or similar cause, such portion of the corpus of this trust estate* as in the discretion of the Trustee is deemed appropriate *shall be paid to her or for her benefit.*

(Emphasis supplied.) As the express language of Mr. Hasty's Will makes clear, William had no authority to encroach upon the corpus of the Marital Trust to effectuate a $1 million gift to Reinhardt University. Although William had the broad power "[t]o acquire, hold, dispose of, retain, invest and reinvest in as [he saw] fit, any property of any nature whatsoever," the Trustee's power to encroach upon the corpus of the Trust was specifically limited to providing for Mrs. Hasty's "proper support [or] maintenance, or to enable her to meet any difficulty produced by sickness, accident, or similar cause." In using Trust assets as collateral for a bank loan and signing the loan documents on behalf of the Trust, William obligated the Trust to repay the loan, which required encroaching upon the principal of the Trust for a purpose other than taking care of Mrs. Hasty. Indeed, repayment of a loan in order to effectuate a $1 million gift to a university does not fall under the kind of support, maintenance, or unforeseen physical difficulty relating to Mrs. Hasty that is contemplated in the Will provisions governing the Trustee's authority to encroach upon the corpus of the trust. Nor would this unauthorized activity serve to strike any sort of fair balance between providing for Mrs. Hasty's needs during her lifetime and preserving the corpus of the estate for the remainder beneficiaries, as the removal of the $1 million from the Trust had nothing to do with Mrs. Hasty's support or maintenance, and it also depleted, rather than preserved, the corpus of the trust for the remainder beneficiaries.

William argues, however, that he should not be liable for breach of trust because he used money from the Marital Trust to make the $1 million gift to Reinhardt based on the professional advice of his accountants, who urged him to reduce the size of the Trust's corpus through charitable donations, collection of executor fees, and distributions to beneficiaries in order to soften the blow of potential tax liability for Mrs. Hasty's Estate following her eventual death. However, reliance on professional advice may only allow a trustee to avoid potential liability for a breach of trust with regard to the exercise of discretion relating to his or her *existing* powers under the controlling trust language. See Restatement (Third) of Trusts § 93, comment (c) (2012) ("Effect of professional advice"). It would not shield a trustee from potential liability where, as here, a trustee takes action pursuant to powers that simply *do not exist* under the relevant trust language. See id. Indeed, where a trustee actually has the authority

or duty to take a specific action and the alleged breach of trust is based on the *manner* in which the trustee performs his or her existing duties, reliance on professional advice may constitute a sufficient indicia of prudence on the part of the trustee in the exercise of his or her authority to show that no breach of trust actually occurred. Id. See also, e.g., OCGA § 53-12-340 (a) ("In investing and managing trust property, a trustee shall exercise the judgment and care under the circumstances then prevailing of a prudent person acting in a like capacity and familiar with such matters, considering the purposes, provisions, and distribution requirements of the trust"). However, where, as here, the trustee had *no* authority under the relevant provisions of the Will to engage in the activity that formed the basis for the breach of trust, reliance on professional advice would not shield the trustee from potential liability. Restatement (Third) of Trusts § 93 comment (c) (2012). This is the case because, with respect to the *existence* of a trustee's powers and duties, reliance on professional advice would not somehow *create* additional powers for a trustee that never existed in the relevant trust documents to begin with. See id.

Indeed, questions of reasonableness do not enter into determinations of the nature and extent of a trustee's powers and duties. Thus, reliance on professional advice cannot validate a trustee's mistaken interpretation of his powers and duties. Here, the issue concerns the parameters of William's duties as Trustee, not the reasonableness with which he performed them. Under the plain language of Mr. Hasty's Will, William overreached his narrowly-tailored power to encroach upon the principal of the Trust only for purposes related to Mrs. Hasty's welfare. Accordingly, the trial court was correct in ruling that William breached his duty to faithfully administer the Marital Trust, and William's alleged reliance on professional advice would not shield him from potential liability for such breach of trust.

4. William is correct, however, in his assertion that the trial court erred in finding that he breached his fiduciary duty as Trustee by acting under a conflict of interest as a matter of law for serving as co-chair of Reinhardt's Capital Campaign Committee while also serving as the Trustee for the Marital Trust.

"Generally, it is not permitted for a fiduciary to be in a position where his interests might conflict with that of a beneficiary" (*Harp v. Pryor*, 276 Ga. 478, 479 (578 SE2d 424) (2003)), and "[a] trustee shall administer the trust solely in the interests of the beneficiaries." OCGA § 53-12-246 (a). That being said, here, there is no apparent or

inherent conflict between the interests of the Trust beneficiaries and William's personal interests as co-chair of Reinhardt's Capital Campaign Committee. William did not stand to gain any tangible benefit solely by being co-chair of the Committee while concurrently serving as Trustee of the Marital Trust. Neither William's own interests in raising funds for the university nor those of the university he represented automatically created a potentially adverse, antagonistic, or competitive situation for the beneficiaries of the Trust. Put another way, it was not "humanly impossible for [William] to act fairly in [the] two capacities and on behalf of [the] two interests" in this case. *Moore v. Self*, 222 Ga. App. 71, 73 (473 SE2d 507) (1996). That William *created* a breach of trust by *choosing* to take money from the corpus of the Trust to donate $1 million to Reinhardt does not necessarily mean that an inherent conflict existed *before* he took such actions, as he could have kept his roles as Trustee of the Marital Trust and co-chair of the Committee completely separate from one another and could have acted fairly in both capacities. Because we find no inherent adversity between William's position as co-chair of Reinhardt's Capital Campaign Committee and his fiduciary duty of loyalty to the Marital Trust beneficiaries, there was no inherent conflict under which William acted when making the loan transactions for the Reinhardt gift. We therefore reverse the trial court's decision to award summary judgment to Joan on the question whether William acted under a conflict of interest simply by serving as Trustee of the Marital Trust while at the same time serving as co-chair of the Reinhardt Capital Campaign Committee.

5. William next argues that the trial court erred in concluding that questions of fact remained as to whether he breached his fiduciary duty by failing to diversify the Trust assets and retaining the Wachovia stock that comprised nearly all of the Trust assets. We disagree.

"In trust law, the cardinal rule is that the trustor-settlor's intention be followed." (Citations omitted.) *Griffith v. First Nat. Bank & Trust Co.*, 249 Ga. 143, 146 (1) (287 SE2d 526) (1982). Here, the Trust language specifies that "any investment made or retained by [the Trustee] in good faith and with reasonable prudence shall be proper." See also OCGA § 53-12-340 (a). William argues that it was proper to retain the Wachovia stock as a Trust asset not only because corporate investors and insiders also failed to diversify their holdings of the Wachovia stock, but also because the stock's historically high dividends helped to pay for Mrs. Hasty's prolonged and expensive health care costs and helped to preserve the Trust's corpus. However, Joan presented evidence that William's retention of the Wachovia

stock was imprudent based on expert testimony that a large concentration of assets in a single security may constitute an unacceptably high risk for a trustee like William who had the duty to preserve the principal of the trust for the remainder beneficiaries.[4] The expert testified that high concentrations of one stock investment such as the Wachovia stock held by the Marital Trust (i.e., where nearly 90% of one's assets are devoted to one stock) may present an unreasonable risk when the investment is supposed to be prudently managed for the benefit of others. As such, there is a genuine dispute as to whether William acted prudently as Trustee of the Marital Trust in retaining the Wachovia stock. Thus, the trial court was correct to find that a question of fact remains for a jury to consider as to whether William breached his duty as Trustee in failing to diversify the Marital Trust assets.[5]

6. Lastly, William argues that the trial court erred in concluding that a question of fact existed as to whether he collected excessive executor's fees under OCGA § 53-6-60. The statute states in relevant part that where, as here,

> the personal representative's compensation is not specified in the will or any separate written agreement, the personal representative for services rendered shall be entitled to compensation equal to . . . [t]wo and one-half percent commission on all sums of money received by the personal representative on account of the estate, except on money loaned by and repaid to the personal representative, and

---

[4] The fact that the stock value decreased precipitously over time does not automatically mean that William did not act prudently by maintaining the Wachovia stock as a trust asset, as "[a] trustee is not liable for losses or depreciation in the value of trust property unless there has *also* been a breach of trust." (Citation omitted; emphasis supplied.) *Citizens & Southern Nat. Bank*, 254 Ga. at 134 (1).

[5] William's argument that his retaining the Wachovia stock was prudent because he was simply abiding by Mr. Hasty's oral instructions and dying wish not to sell the stock is unavailing. Oral instructions, as parol evidence, are inadmissible as proof of a separate agreement unless: (1) the written agreement — in this case, Mr. Hasty's Will — is silent as to the subject matter of the instructions; (2) the oral instructions are not inconsistent with the terms of the written agreement; and (3) the written agreement is not the final agreement between the parties. See *Namik v. Wachovia Bank of Ga.*, 279 Ga. 250, 251 (612 SE2d 270) (2005). Here, not only is the Will the final agreement between Mr. Hasty and William as Trustee, but Mr. Hasty's alleged oral instructions are entirely inconsistent with the express language of the Will. More specifically, although the Will granted William, as Trustee, the discretion to "retain, invest and reinvest" Trust assets "as [he] s[aw] fit," the alleged oral instruction requiring William to retain the Wachovia stock would have essentially eliminated William's discretion to manage the Trust's primary investment. William cannot rely on this alleged oral instruction that undercuts the express terms of the Will to shield himself from his individual responsibility to prudently manage the Trust investments.

> 2 1/2 percent commission on all sums paid out by the personal representative, either for debts, legacies, or distributive shares[.]

OCGA § 53-6-60 (b) (1). The record shows that the $425,000 William collected in executor's fees for the administration of his father's Estate is based on calculations by his accountants. However, Joan presented evidence that William may have miscalculated his earned commission under OCGA § 53-6-60 in excess of $184,307. For example, William may have applied a five percent commission on all transfers in and out of the Estate in order to set his compensation higher than the amount that he was authorized to collect under OCGA § 53-6-60 (b) (1), rather than charging a two and one-half percent commission on transfers in and a two and one-half percent commission on transfers out of the Estate as authorized by the statute.[6] The trial court was therefore correct to conclude that questions of fact remained as to whether William collected excessive executor's fees under OCGA § 53-6-60.

Judgments affirmed in part and reversed in part. All the Justices concur, except Hunstein, J., who concurs in judgment only as to Division 1 and Blackwell, J., who concurs in judgment only as to Division 2.

DECIDED OCTOBER 7, 2013.

Roy E. Barnes, Allison B. Salter, James C. Tribble, for appellant.
Caldwell & Watson, Wade H. Watson III, Laura K. Bonander, for appellee.

---

[6] William contends that, even if he collected more in executor's fees than he was entitled to collect, he is excused from fault because the fees collected reduced the Estate's potential tax liability. We must note, however, that William's motive for collecting excessive fees has nothing to do with the initial question whether he simply collected excessive fees under the applicable statutory provisions to begin with. Indeed, the question whether one's motivation for a particular course of action may or may not be commendable is separate from the question whether that course of action itself is legally permissible.