**THIRD DIVISION**
**MILLER, P. J.,**
**RAY, and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**July 15, 2016**

# In the Court of Appeals of Georgia

A12A2516. ROLLINS et al. v. ROLLINS et al.

RAY, Judge.

This case involves a dispute over trusts associated with a large estate. It comes to our Court for the third time, having also twice visited the Supreme Court of Georgia.[1] The case began in 2010 when four of the nine beneficiaries[2] of trusts set up by their grandfather, successful businessman O. Wayne Rollins (the "Settlor"), sued their father, Gary W. Rollins, and their uncle, R. Randall Rollins, individually and as

---

[1] *Rollins v. Rollins*, 321 Ga. App. 140 (741 SE2d 251) (2013) (*Rollins I*), reversed in part, vacated in part, and remanded by *Rollins v. Rollins*, 294 Ga. 711 (755 SE2d 727) (2014) (*Rollins II*); *Rollins v. Rollins*, 329 Ga. App. 768 (766 SE2d 162) (2014) (*Rollins III*), vacated and remanded by *Rollins v. Rollins*, 298 Ga. 161 (780 SE2d 328) (2015) (*Rollins IV*).

[2] Glen W. Rollins, Ruth Ellen Rollins, Nancy Louise Rollins, and O. Wayne Rollins II (collectively, "the Plaintiffs").

trustees; and Henry B. Tippie, as trustee (collectively, the "Defendants"). Their amended complaint alleged, in brief, breaches of trust and of fiduciary duty regarding a failure to make proper accountings, making trust investments in illiquid family-owned entities, creating a conduct-based distribution scheme, creating conflicts of interest, and failing to maximize income distributions. They also asserted claims for an accounting, constructive fraud/recision, and fraudulent misrepresentation. *Rollins IV*, supra at 163-164. The parties filed cross-motions for summary judgment. The trial court ruled in the Defendants' favor on each of the Plaintiffs' claims, except for a breach of trust claim related to the Defendants' failure, at any time prior to the filing of the suit, to make required periodic accountings to the Plaintiffs of the assets held in the trusts. See id. at 164 and n. 6. The Plaintiffs filed the instant appeal, which continues to wend its way between our appellate courts.

In their original appeal before this Court, see *Rollins I*, supra, the Plaintiffs argued that the trial court erred in not granting them an accounting of the business entities, held within the trusts, which hold trust assets. They also argued that the trial court erred in failing to rule that: the Defendants breached their fiduciary duties or duties of trust by their conduct at the business entity level, rather than at the trust level; in creating a "false and misleading" distribution scheme imposing conduct-

2

based requirements not found in any trust instrument; by replacing marketable securities in the trusts with illiquid investments in debt-ridden trust entities under the trustees' permanent control; in ruling that the Plaintiffs had to show actual harm to prevail on their fiduciary duty claims and in finding that they were not harmed by being "cut off" from trust distributions and assets; and in granting summary judgment to the Defendants because material factual disputes remained.

The further procedural history of the case is rather involved, and as the Supreme Court outlines this in *Rollins IV*, supra at 164-167, we will not unnecessarily repeat it here. Rather, we will simply note that in *Rollins IV*, the Supreme Court determined, inter alia, whether the applicable Defendants were to be held to a corporate- or partner-level fiduciary standard or to a trustee-level fiduciary standard related to the actions and decisions about which the Plaintiffs complain.[3] The

---

[3] The Supreme Court most recently granted certiorari to determine whether this Court erred in determining that a jury must decide which fiduciary standard applies. When the Supreme Court

> considers only a portion of a Court of Appeals' opinion and reverses, it
> is for the Court of Appeals to determine on remand whether the portions
> of its earlier opinion that were not considered by this Court are
> consistent with this Court's ruling. If such portions are consistent with
> this Court's ruling, then they become binding upon the return of the

3

Supreme Court vacated our opinion in *Rollins III* and remanded the case to us with direction. See *Rollins IV*, supra. We thus proceed accordingly.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c).

> Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the grant [or denial] of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citations and punctuation omitted.) *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010). See also *Morgan Enterprises, Inc. v. Gordon Gillett Business*

---

> remittitur. If, however, such portions are not consistent with this Court's ruling, the Court of Appeals must enter an appropriate disposition concerning those portions that reconciles them with this Court's ruling.

*Shadix v. Carroll County*, 274 Ga. 560, 563 (1) (554 SE2d 465) (2001). See also *Rollins IV*, supra at 166, n. 8.

4

*Realty, Inc*., 196 Ga.App. 112, 112 (395 SE2d 303) (1990) (defining standard on cross-motions for summary judgment).

This case turns on claims of breach of fiduciary duty and breach of trust. "It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." (Citations omitted.) *Griffin v. Fowler*, 260 Ga. App. 443, 445 (1) (579 SE2d 848) (2003). "A breach of trust is a violation by the trustee of any duty which as trustee he owes to the beneficiary." (Citation omitted.) *Citizens and Southern Nat. Bank v. Haskins*, 254 Ga. 131, 134 (I) (1) (327 SE2d 192) (1985).

As outlined by the Supreme Court, the facts are as follows:

Each of the four [P]laintiffs/appellees is (or was until age 45 when the trust assets were transferred to him or her) the beneficiary of a Subchapter S-Trust established by their grandfather O. Wayne Rollins in 1986. Defendant Gary Rollins (Wayne's son and plaintiffs' father) is the trustee of these S-Trusts. Although at least two of the S-Trusts have now terminated as a result of the age of the beneficiary, and the assets of those trusts have been transferred to the individual beneficiary, for simplicity's sake we will refer to the interests originally held in these trusts as the S-Trusts.

5

In 1968, in what became an ongoing effort to establish a network of entities to preserve and convey assets to his heirs, Wayne first established the Rollins Children's Trust ("RCT"), and each of his grandchildren are the beneficiaries of RCT. Wayne created several family entities to hold RCT's assets, including Rollins Holding Company ("RHC") and LOR, Inc. ("LOR"). The S-Trusts hold minority interests in these family entities, and defendants Gary Rollins and his brother Randall Rollins are the managers of these entities. Later, in 1988, Wayne created a general partnership, Rollins Investment Fund, known as RIF. Each plaintiff's S-Trust is a partner in RIF, along with the S-Trusts of the other grandchildren; Gary, Randall, and the Estate of O. Wayne Rollins are also partners. Upon reaching age 45, a beneficiary's S-Trust is terminated and the beneficiary becomes a partner in RIF. As a result of this structure, most of the family-owned assets in dispute in this case are ultimately held in the RIF partnership and, until a plaintiff reaches age 45, each plaintiff's partnership interest is held in trust. The original partnership agreement authorized only pro rata distributions of cash flow to the partners "at such times as the [p]artners shall reasonably decide" to make distributions.

Wayne died in 1991. In 1993, the RIF partnership agreement was amended so that, inter alia, for the first time since its inception, non-pro rata distributions could be made in the form of redemptions from a partner's capital account. The amendment also changed the structure of the partnership by vesting exclusive authority to manage the partnership and make distribution decisions in Gary and Randall, who were named managing partners. . . .

6

Gary and Randall contend that the primary purpose of this amendment was to permit Wayne's estate to redeem assets to fulfill a charitable pledge in a manner that permitted the remaining partners to avoid capital gains taxes on the assets that were liquidated. Several years after this amendment, Gary and Randall created a distribution program whereby the two of them, in their capacities as RIF managing partners, may authorize non-pro rata distributions from the partnership capital accounts of the S-Trusts, or directly to the partnership accounts of the grandchildren if their S-Trusts have terminated by virtue of their age, based upon a formula that includes a personal code of conduct for eligibility. Gary and Randall also created several new family entities controlled by them and funded by RCT assets. Gary and Randall contend these new entities were established primarily for the purpose of estate planning for future generations and also to minimize tax liability.

*Rollins IV*, supra at 162-163.

1. We first address the questions of whether Gary and Randall, acting as partners, breached their applicable duties when they executed the RIF amendment; and whether Gary, acting as a trustee of his children's S-Trusts, breached his trustee-level duties when he voted on behalf of the S-Trust partners to execute the amendment. See *Rollins IV*, supra at 170-171 (1) (c) (i).[4]

---

[4] Because the arguments in this case have evolved somewhat over its history, it is important to note that supplemental briefs, while useful to the Court, may not be used to expand the issues beyond those identified in the original enumerations of

Specifically, the Plaintiffs argued that in 1993, Gary and Randall executed a "unilateral" amendment to the RIF partnership agreement, which, as noted above, allowed non pro rata redemptions from partners' capital accounts, named Gary and Randall as managing partners, and gave them exclusive authority to manage the partnership and make distribution decisions. As the Supreme Court noted, "[t]his amendment to the partnership agreement is the catalyst around which all the disputes in this case revolve." Id. at 163.

(a) *Gary's actions as trustee of his children's S-Trusts*. The Supreme Court held that in voting for the amendment as a trustee for the Plaintiffs' S-Trusts, Gary is to be held to the applicable duty a trustee owes to beneficiaries, in light of the terms of the trust instrument and the Settlor's intent. *Rollins IV*, supra at 171-172 (1) (c) (i). Because fact questions remain, we find that the trial court erred in granting summary judgment on this point.

Georgia trust law requires trustees to "administer the trust[s] solely in the interests of the beneficiaries[,]" OCGA § 53-12-246 (a), and imposes upon them a

error. *Blockum v. Fieldale Farms Corp.*, 271 Ga. App. 591, 592 (1) (610 SE2d 82) (2005).

8

duty of impartiality unless the "trust instrument clearly manifests an intention that the trustee shall or may favor one or more of the beneficiaries[.]" OCGA § 53-12-247.

Evaluating this question in light of the trust instrument and the Settlor's intent, our law is clear that a trustee has a duty to exercise discretionary powers in good faith. OCGA §§ 53-12-7 (a) (4), 53-12-260. Further, "[n]o provision in a trust instrument shall be effective to relieve the trustee of liability for a breach of trust committed in bad faith or with reckless indifference to the interests of the beneficiaries." OCGA § 53-12-303 (a). As noted above, each beneficiaries' S-Trust is or was a partner in RIF. When a beneficiary reaches age 45, his or her S-Trust terminates, and the beneficiary him- or herself becomes a partner in RIF. *Rollins IV*, supra at 162-163. Thus, under the original RIF agreement, when each beneficiary reached the age of 45 and became an RIF partner, that beneficiary would have had a say in any distribution plan.[5]

When Gary and Randall amended the RIF, they concentrated all voting power in themselves and removed it from the beneficiaries, putting themselves exclusively in charge of non pro rata distributions. The amended RIF agreement provides that the

---

[5] The original RIF partnership agreement provided that "'Cash Flow' for any year . . . shall be distributed to the Partners *at such times as the Partners shall reasonably decide*, pro rata to each Partner's interest." (Emphasis supplied.)

9

partnership "intends to make periodic distributions of cash to the Partners at such times, in such amounts, and among the Partners in such proportions as the Managing Partners may determine in their *sole and absolute* discretion." (Emphasis supplied.) The amendment also provides that the managing partners, Gary and Randall, "shall have complete and exclusive authority to manage and conduct the Partnership's business and affairs. *No other Partner shall participate . . . or have any right or authority*[.]" (Emphasis supplied.) As the Supreme Court noted, the Plaintiffs' S-Trusts, whose partner interests Gary voted to amend the RIF agreement, granted broad discretion to Gary as trustee. He was able

> to do all things . . . as may be deemed necessary and proper, including . . . [t]o retain and carry on any business in which the trust acquires an interest, . . . to join with other owners in adopting any form of management for any business or property in which the trust may have an interest, [and] to become or remain a partner, general or limited, in regard to any such business or property . . .

*Rollins IV*, supra at 169 (1) (b) (ii) (citing the S-Trust indenture). The Supreme Court has noted that a trustee's duty is to administer the trust in accordance with its terms and purposes. *Hasty v. Castleberry*, 293 Ga. 727, 733 (3) (749 SE2d 676) (2013). So, although there can be no debate that Gary as trustee had the power to agree to an

10

amendment of the RIF partnership on behalf of the S-Trusts, this does not foreclose the requirement under general trust law that Gary, in his role as trustee, had to do so in good faith and consistent with the trust's terms and purposes.

"Notwithstanding the breadth of discretion granted to a trustee in the trust instrument, including the use of such terms as 'absolute,' 'sole,' or 'uncontrolled,' the trustee *shall exercise a discretionary power in good faith*." OCGA § 53-12-260 (emphasis supplied). The trust instrument at issue here does not use such terms, though it does grant the trustees the power to adopt "any form of management." See also *Harp v. Pryor*, 276 Ga. 478, 479 (578 SE2d 424) (2003) ("Generally, it is not permitted for a fiduciary to be in a position where his interests might conflict with that of a beneficiary") (citation omitted).

The Plaintiffs point to Gary and Randall's post-amendment execution of a "Unanimous Consent of the Managing Partners of Rollins Investment Fund to Action Without a Meeting," in which they decided to distribute $9 million to "certain partners in RIF." The Plaintiffs contend that neither they nor their S-Trusts received any part of this distribution; that the money was distributed to Randall's children, who did not sue; and that absent the amendment, they would have been entitled to these and other distributions pro rata. They also contend that by dismantling the

11

Settlor's pro rata structure, Gary and Randall created a conflict of interest under which they could favor themselves and others over the Plaintiffs when making distributions from RIF. They point out, for example, that in 2009, S-Trust distributions between partners varied widely, including a $1 million distribution to Gary, while plaintiff Wayne Rollins's S-Trust received nothing.

Gary and Randall counter that the agreement was amended "with expert legal advice and assistance from King & Spalding" to provide for non pro rata distributions so that the estate of O. Wayne Rollins, which was a partner, could redeem stock to fulfill a charitable pledge. They contend that the amendment's purpose was to minimize capital gains taxes for all partners and to allow them to make distributions to the beneficiaries' S-Trusts but not their own. They also contended that, following the amendment, they made a significantly greater proportion of distributions from RIF to the Plaintiffs than they have taken for themselves.

In assessing Gary's intent at the time the amendment was made, a jury would look not just at the bare language of the amendment itself and Gary's use of his authority in making it, but also at the subsequent fruits of that amendment and what they reveal about Gary's intent at the time he executed the amendment. For example, Gary and Randall later implemented a code of conduct which applied to the

12

beneficiaries, but not to Gary and Randall. This code conditions distributions – whether pro rata or not – from various entities on the beneficiaries' adherence to behavioral strictures. As Gary testified, he and Randall made non pro rata distributions from RIF in which they sometimes gave money to themselves but not to the Plaintiffs' S-Trusts. Gary further acknowledged telling the Plaintiffs, in relation to the instant lawsuit, "[a]ny litigation and there will be no distribution." Gary and Randall also caused formerly marketable assets to be invested in illiquid family entities and altered the power structure of RIF such that the beneficiaries lost the right, granted in the original amendment, to vote their own interests once they turned 45. In depositions, Gary acknowledged wanting to lock up trust assets and saying that the Plaintiffs were "not going to get the assets that are in this trust" in reference to the S-Trusts and "any" other trust in which Plaintiffs had an interest. Further, the RIF amendment limited Gary and Randall's liability in their new roles as managing partners to a greater extent than under the original RIF's partnership liability standard. For example, the original RIF agreement limited *each* partner's liability to the *partnership only* for acts within the scope of authority conferred by the agreement, whereas the amended RIF agreement limits the *managing partners*' liability to *both* the partnership and the individual partners.

From these facts, a jury could find that Gary and Randall acted against the interests of the Plaintiffs in bad faith, and even in an arbitrary or retaliatory manner. A jury could believe that differential distributions indicated a conflict of interest, and that the Plaintiffs were harmed not just by loss of access to assets but also by a loss of voting rights and power that would have accrued when they turned 45. As Gary and Randall sought "expert legal advice and assistance from King & Spalding" in their quest to amend the partnership agreement, a jury could decide that they had both the time and means to structure the amendment in an attempt to disguise improper motives.

> As the Revised Trust Code and the common law agree, ... a court may interfere with an exercise of discretion by a trustee only if that discretion is 'infected with fraud or bad faith, misbehavior, or misconduct, *arbitrariness, abuse of authority or perversion of the trust, oppression of the beneficiary*, or want of ordinary skill or judgment.'

(Emphasis supplied.) *McPherson v. McPherson*, 307 Ga. App. 548, 552 (1) (b) (705 SE2d 314) (2011), citing *Haskins*, supra at 142 (II) (9). For example, our Supreme Court has determined that a trial court had the authority to intervene in the administration of a trust where the primary trust purpose was to provide for the beneficiary's welfare, but the trustees arbitrarily limited support payments because

14

they disliked the beneficiary's wife and wanted to preserve the corpus for residual beneficiaries. *Citizens & Southern Nat. Bank v. Orkin*, 223 Ga. 385, 390-391 (1) (156 SE2d 86) (1967). See also *Wachovia Bank of Ga., N. A. v. Namik*, 275 Ga. App. 229, 234 (3) (b) (620 SE2d 470) (2005) (bad faith is not merely bad judgment or negligence, but imports, inter alia, some "moral obliquity" and breach of duty through a motive of interest or ill will).

On the other hand, Gary and Randall presented testimony that there were legitimate bases for the RIF amendment's provision for non pro rata distributions that related to tax advantages and/or liability and to fulfill a charitable pledge, and that the concentration of management power was a benefit to their descendants. Again, those decisions were supposedly made with expert advice from King & Spalding,[6] and in considering this and other factors, a jury could find that Gary and Randall made every possible effort to act appropriately, with proper motives, and in the utmost good faith. *Namik*, supra. Because fact questions exist, we again find that the trial court erred in its summary judgment decision.

---

[6] In volunteering information about the advice they received from King & Spalding, and also from Arthur Andersen, in connection with certain relevant transactions, it is unclear to this Court if the Defendants mean to waive or have waived attorney-client and accountant-client privilege, thus making such information discoverable at trial. This issue remains for the trial court to resolve.

(b) *Gary and Randall's decision, as individual RIF partners, to vote in favor of the amendment*. OCGA § 14-8-18 provides that "[t]he rights and duties of the partners in relation to the partnership shall be . . . subject to any agreement between them[.]"

The original RIF partnership agreement states that it may be amended with the "consent of all Partners," and it was amended through a unanimous vote of the partnership interests of Gary and Randall, and their voting, as trustees, of the beneficiaries' S-Trust partnerships and the O. Wayne Rollins's estate partnership.[7] See *Rollins IV*, supra at 170 (c). The original partnership agreement also authorizes "[a]ny one of the Partners . . . to execute documents on behalf of the Partnership." Additionally, the original partnership agreement gives the partners the authority and discretion to "deal with themselves or one another in the conduct of the Partnership's business and affairs and no prohibition or restriction shall be deemed to be placed thereon" and to "take any actions . . . that the Partners deem reasonably appropriate to carry out the objectives of the Partnership." While the agreement does not specifically list "objectives," it states, in pertinent part, that the "character of the

---

[7] The beneficiaries, as individuals, initially were not partners in RIF. Rather, each S-Trust was an RIF partner, and the trustee had the authority to vote on behalf of his children's S-Trusts.

16

business of the Partnership shall be to make, acquire, hold, manage, assign, convey and dispose of investments on behalf of the Partners[.]" The agreement also states that the partners are not liable to the partnership for any acts within the scope of their authority under the agreement, other than their own acts of "malfeasance, gross negligence or intentional misrepresentation." As the Supreme Court found,

> any duty owed by Gary and Randall [in their role as RIF general partners] to disclose the terms and consequences of the amendment to the other RIF partners was owed to the S-Trusts and not the beneficiaries themselves. Since Gary is the trustee of each of his children's S-Trusts he would have owed this partnership duty of disclosure to himself as the representative authorized to act and make decisions on behalf of each of these S-Trust partners.

(Footnote omitted.) *Rollins IV*, supra at 172 (1) (c) (ii).

For this reason, and also given the terms of the original agreement, there can be no debate that Gary and Randall had the power to agree, as partners, to the amendment of the RIF partnership on behalf of the S-Trusts, and no fact question remains as to whether they are liable to the *partnership* itself in this regard, as the Plaintiffs acknowledge. However, while the original partnership agreement limits an individual partner's liability to "the Partnership," it does not limit a partner's liability to his or her individual partners as does the amended agreement. See *Rollins IV*, supra

17

at 173 (1) (c) (ii), n. 16. And, although the duties of partners are subject to anything on which they agree, OCGA § 14-8-18, partners still must act toward other partners with the "utmost good faith and with the finest loyalty." (Citations and punctuation omitted.) *AAF-McQuay, Inc. v. Willis*, 308 Ga. App. 203, 211 (1) (c) (707 SE2d 508) (2011).

As we determined in Division (1) (a), above, fact questions remain as to whether Gary acted in good faith in executing the amendment in his role as trustee. Even though in this iteration of the claim Gary has donned his partner cloak,[8] logic of course dictates that those same fact questions would arise in his decision to execute the amendment as an RIF partner. As discussed above, the Supreme Court has determined that Gary owes partnership duties only to the Plaintiffs' S-Trusts and owes duties of disclosure only to himself as trustee. Unsurprisingly, the record contains no indication that Gary has taken any action as trustee on behalf of the S-Trusts in challenging the RIF amendment. The Plaintiffs argue that, notwithstanding this determination, as beneficiaries of trusts that are partners in RIF, they may sue

---

[8] Compare *Saltzman v. Commr. of Internal Revenue*, 131 F.3d 87, 90 (I) (2d Cir.1997) ("A trustee cannot alter his legal position by changing his cloak") (citation and punctuation omitted).

18

Gary and Randall directly for violation of their fiduciary duties because they have no one else to protect their rights.[9]

As an initial matter, to the extent that certain Plaintiffs have reached age 45 and become partners, there would of course be a partnership duty of good faith owed directly to those beneficiary-partners, and no longer to their S-Trusts. As a result, in this context and for the reasons outlined above, we find that issues of fact remain and the trial court erred.

As for those Plaintiffs who have yet to reach age 45, as the Plaintiffs argue, there still might be a right of action. See *Restatement (Second) of Trusts* § 282 (2) (1959) ("If the trustee improperly refuses or neglects to bring an action against the third person, the beneficiary can maintain a suit in equity against the trustee and the third person.") There is support for this idea in Georgia law. "As a general rule, where the legal title is in a trustee, such trustee is the proper person to maintain or defend actions involving the trust estate. An exception to this rule is where the trustee refuses to act." (Citations omitted.) *Stout v. Mass. Mut. Life Ins. Co.*, 183 Ga. 649, 658 (3) (189 SE 248) (1936). See also *Field v. Mednikow*, 279 Ga. App. 380, 381 (1) (a) (631 SE2d 395) (2006) ("[W]here the executor refuses to pursue a claim by the estate to

_____

[9] Indeed, the Plaintiffs sued Gary and Randall in their individual capacities.

19

set aside an allegedly invalid deed, the beneficiaries of the estate may assert the claim").

However, the trial court never has ruled on the issue of whether the trustee refused or failed to act on the Plaintiffs' behalf or on whether the individual beneficiaries must show or have been relieved of showing a failure to act in the face of any demand for action made upon the trustee. Nor did the trial court's order discuss any statute of limitation issues that may exist. See *Mayfield v. Heiman*, 317 Ga. App. 322, 325 (1) and 329 (4) (b) 730 SE2d 685) (2012). As a result, we must remand this matter to the trial court for consideration.

2. The Plaintiffs also argue that the trial court erred in failing to find that Gary and Randall breached their fiduciary duties when they implemented a "false and misleading distribution scheme" with no basis in any trust instrument. The Plaintiffs argue that the "scheme" conditioned financial distributions on the Plaintiffs' adherence to a behavioral code of conduct and, thus, allowed the trustees to manipulate income distributions.

The distributions came from the Plaintiffs' own trust assets, according to Randall's testimony.[10] Those accounts are assets of each Plaintiff's S-Trust, if he or she has not yet reached age 45. As we noted in Division (1) (a), above, Gary and Randall did not subject themselves to this code of conduct. As a result, under the RIF amendment allowing non pro rata distributions, Gary and Randall sometimes gave themselves distributions through RIF, but did not make distributions to the Plaintiffs' S-Trusts. As the Supreme Court determined, Gary and Randall implemented these conduct-based criteria in their capacity as managing partners of the amended RIF partnership agreement and, thus, must be held to the partnership standard of duty. See *Rollins IV*, supra at 173-174 (2).

The amended RIF agreement gives Gary and Randall as managing partners "complete and exclusive authority" to manage and conduct the partnership's business and affairs. The amendment also gives Gary and Randall discretion to make periodic cash distributions to partners at such times and in such amounts as they determine. However, even assuming (which we do not, as outlined in Division (1)) that Gary and

[10] In deposition testimony, Randall was asked, "[E]ven though you were taking money from the assets held in trust for my clients, you and Gary were imposing requirements on these distributions that did not have any basis in the trust instruments, correct?" To which Randall replied, "That's correct."

21

Randall were authorized to amend the RIF agreement such that a code of conduct could be utilized to facilitate non pro rata distributions, they still would be required under the partnership standard of duty to implement such a code in good faith. They also would be required to make any distribution decisions, even discretionary ones, in good faith. As OCGA § 23-2-58 provides, in the relationship between partners, "the law requires the utmost good faith[.]" See *AAF-McQuay*, supra at 211 (1) (c) (partners owe one another duties of the "utmost good faith" and "finest loyalty") (citation and punctuation omitted).

The Plaintiffs argue that the code of conduct evidences bad faith because it applies only to the grandchildren-beneficiaries and not to Gary and Randall. The Plaintiffs also argue that Gary and Randall showed bad faith in using the code to control the Plaintiffs and prevent them from accessing their own trust assets. As an example of how Gary and Randall attempted to control their behavior, the Plaintiffs cite to Gary's deposition testimony, where he acknowledged telling them, in relation to the instant lawsuit, "[a]ny litigation and there will be no distribution." They also point to a conflict of interest, given that the code of conduct has no basis in any trust instrument and thus had to be implemented at the partnership level in order to skirt trust requirements.

Gary and Randall present no argument as to how the code of conduct served the partnership. See *Solomon v. Solomon*, 2 Ga. 18, 25 (1) (1847) (partners are bound to use partnership property for the benefit of the partnership interest). They instead focus their contentions on the fact that the code of conduct, which required attendance at family meetings and engagement in meaningful pursuits such as full-time work or full-time parenting, applied equally to all beneficiaries, not just the Plaintiffs. They also argue that they were not required to make *any* distributions from RIF.

The Plaintiffs clearly have provided evidence that they do not have the same access to partnership assets as do Gary and Randall. See *Bennett v. Smith*, 108 Ga. 466, 468 (34 SE 156) (1899) ("As a general rule, one partner is as much entitled to possession of the assets of the firm as the other"). Again, partners have a duty to act toward other partners with loyalty and good faith. See *AAF-McQuay, Inc.*, supra. In the civil context, our appellate courts have determined that "[b]ad faith is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies a conscious doing of wrong, and means a breach of a known duty through some motive of interest or ill will." (Footnote and punctuation omitted.) *Namik*, supra at 234 (3) (b). See generally *Vickers v. Motte*, 109 Ga. App. 615, 620

(137 SE2d 77) (1964) (bad faith "contemplates a state of mind affirmatively operating with a furtive design" and while it "may not always denote malicious intent to injure, the term should be construed within the context of the subject matter involved").

As the Supreme Court determined, in contexts such as this, Gary and Randall owe or owed no partnership duty to the Plaintiffs where only the Plaintiffs' trust accounts rather than the Plaintiffs themselves held partnership status, and that Gary, as trustee of his children's trusts, owed partnership duties only to himself. See *Rollins IV*, supra at 172 (1) (c) (ii). However, as we determined in Division (1) (b), given that Gary allegedly has not taken action on behalf of the Plaintiffs' S-Trust partners and that the Plaintiffs may have no other recourse to protect their interests, they might be able to pursue their claims as beneficiaries. See *Restatement (Second) of Trusts* § 282, supra; *Stout*, supra; *Field*, supra. Again, for those Plaintiffs who have not reached age 45, the trial court must determine whether the trustee refused or failed to act on their behalf or whether the individual beneficiaries must show or have been relieved of showing a failure to act in the face of any demand for action made upon the trustee. For those Plaintiffs who are 45, they are entitled to pursue said claims directly as partners.

Even evaluating Gary and Randall's actions under the more lenient partnership standard (as opposed to the more stringent trustee standard),[11] a jury could find evidence of bad faith. A jury could find evidence of bad faith because Gary and Randall created a code of conduct that applied only to the grandchildren-beneficiaries, did not apply to Gary and Randall, and facilitated the Plaintiffs' loss of access to their own assets,[12] and because said code of conduct arguably did not promote any partnership interest. A jury also could find evidence that Gary and Randall knew they owed the Plaintiffs a duty of good faith, but exercised a "motive of interest" in choosing to control Plaintiff's assets and make disparate distributions

---

[11] We note that the original partnership agreement did not permit non pro rata distributions, although the amended agreement under which the code of conduct was implemented does. We also note, as discussed elsewhere in this opinion, that the amended RIF agreement somewhat diminishes Gary and Randall's liability for their partnership decisions.

[12] The Plaintiffs contend broadly that the trial court erred in ruling that they failed to show actual harm to support a claim for breach of fiduciary duty. The trial court specifically ruled on this point only in the context of the imposition of the code of conduct on S-Trust distributions. Although Defendants argue otherwise, because a jury question exists as to whether Gary and Randall acted in good faith, we cannot say that the Plaintiffs would suffer no harm when they are denied access to assets for extended periods of time, or in perpetuity, and where they must resort to protracted litigation to attempt to obtain access to those assets. See *Glisson v. Freeman*, 243 Ga. App. 92, 104 (1) (532 SE2d 442) (2000). See also *Ringer v. Lockhart*, 240 Ga. 82, 84-85 (239 SE2d 349) (1977).

25

through a behavioral code they did not apply to themselves. See *Namik*, supra. On the other hand, if a jury finds that Gary and Randall acted in good faith to implement the amended RIF agreement permitting non pro rata distributions, they also could find that the code of conduct was implemented in good faith because it, at least facially, applies equally to all the grandchildren-beneficiaries. Either way, a question of fact remains for the jury.

3. The Plaintiffs allege that they have been harmed by various decisions Gary and Randall made in their management of and distributions from the family entities RHC and LOR. They argue, inter alia, that Gary and Randall "locked up" control over assets, inappropriately diverted assets between family entities, saddled the Plaintiffs' interests with debt, and inappropriately retained and distributed assets. .[13] See *Rollins IV*, supra at 167 (1) (a).

As the Supreme Court has noted, the Plaintiffs' S-Trusts hold minority interests in these family entities. In the specific context at issue here, Gary and Randall are held to a "corporate level fiduciary standard when acting as directors," *Rollins II*,

---

[13] We find no enumeration, argument, or record citations in the Plaintiffs' original appellate brief raising the issue of retained earnings in LOR. Thus, we do not address this issue. *Blockum*, supra at 592 (1).

supra at 715 (2), and in regards to their management of the corporate family entities held in the trusts. *Rollins IV*, supra at 167-168 (1) (a).

> A corporate officer or director owes to the corporation and its stockholders a fiduciary or quasi-fiduciary duty, which requires that they act in utmost good faith. Directors and officers in the management and use of corporate property in which they act as fiduciaries and are trustees are charged with serving the interests of the corporation as well as the stockholders.

(Citation and punctuation omitted.) *Enchanted Valley RV Resort, Ltd. v. Weese*, 241 Ga. App. 415, 423 (5) (526 SE2d 124) (1999). See also OCGA §§ 14-2-830 (a) (1); 14-2-842 (a) (1). Further, directors owe the corporation and stockholders three primary duties: to exercise only such "corporate powers" granted by the corporation's own rules, to exercise reasonable care, and to provide a duty of "undivided good faith since they are fiduciaries and trustees of their corporation and stockholders." (Citations and punctuation omitted.) *Milton Frank Allen Publications, Inc. v. Ga. Assn. of Petroleum Retailers, Inc.*, 224 Ga. 518, 527-528 (4) (162 SE2d 724) (1968).

In arguments that overlap in both presentation and discussion and are thus somewhat unclear and contradictory, the Plaintiffs contend that distributions stemming from these family entities were subjected to the code of conduct, resulting

in "wildly varying distributions for each beneficiary." However, they also acknowledge that Gary and Randall "could not make disparate dividends from LOR and RHC" and so "simply slashed dividends from these corporate entities and engaged in transactions to divert income from these entities to other entities they control[.]" They contend that Gary and Randall used the code of conduct and the amendment allowing non pro rata distributions through RIF as a vehicle for reducing the LOR and RHC pro rata dividends by more than 90 percent, while pumping up their own distributions by diverting assets through the non pro rata system allowed by the RIF amendment. The Plaintiffs also argue that they were misled by Gary and Randall's claims of being "trustees" who could alter the distribution systems of family entities, including LOR, that were not trusts based on a code of conduct.

The "corporate powers" as laid out in the RHC Articles of Incorporation give the Board of Directors the power to make distributions from "capital surplus," entitle the holders of various classes of stock to receive dividends in cash or other property "when and as declared by the Board," which included Gary and Randall, "on such dates as may from time to time be determined by the Board[.]" LOR's articles of incorporation and various amendments contain similar provisions.

Thus, to the extent that the Plaintiffs are claiming that Gary and Randall have reduced the pro rata dividends paid through LOR and RHC compared with prior years, or have retained earnings, we find no breach of fiduciary duty and no fact questions because Gary and Randall had authority through the corporate bylaws to make those decisions. However, to the extent that the Plaintiffs argue that Gary and Randall subjected the Plaintiffs' pro rata distributions to the code of conduct (for which there is no provision in LOR or RHC), a fact question remains for trial.[14]

4. The Plaintiffs argue that the trial court erred in failing to grant their motion for summary judgment on the issue of whether Gary and Randall breached their fiduciary duties when they executed RHC and LOR shareholder agreements that prohibit shareholders from selling or disposing of their shares to those outside the family without company consent. In 1999, Gary executed the RHC and LOR

---

[14] On this point, a jury could consider Gary and Randall's representation of themselves as trustees of trusts that did not exist in order to impose conduct-based criteria on the Plaintiffs' money as evidence of bad faith. "Good faith . . . requires that the stockholders be treated fairly[.]" *Comolli v. Comolli*, 241 Ga. 471, 474 (1) (246 SE2d 278) (1978) (in case involving directors' use of corporate funds to purchase corporation's own stock as means of depreciating minority shareholder's interests and freezing his investment). See generally *Nalley v. Langdale*, 319 Ga. App. 354, 365 (2) (734 SE2d 908) (2012) (where a fiduciary has falsely represented information related to a transaction, "whether that representation was made negligently, fraudulently, or in good faith remains for the jury to resolve").

29

shareholder agreements at issue on behalf of the Plaintiffs' S-Trusts in his capacity as trustee, and we evaluate his actions under a trustee-level standard of fiduciary duty. See *Rollins IV*, supra at 170 (1) (b) (ii) and n. 11.

The Plaintiffs allege that Gary and Randall breached their fiduciary duty as directors in "locking up" or inhibiting the alienability of the stock, which passed or will pass to the beneficiaries "free of trust" when they reach age 45.

The S-Trust agreement authorizes trustees to "do all things and to execute such instruments as may be deemed necessary and proper[,]" to "agree to or take any other action in regard to any . . . proceeding affecting any stock," and to "retain and carry on any business in which the trust acquires an interest . . . [and] to join with other owners in adopting any form of management for any business or property in which the trust may have an interest[.]"

It seems clear that under the broad discretion granted to him by the S-Trust, Gary had the authority to execute such shareholder agreements. However, a jury could find that Gary did so in bad faith to prevent the Plaintiffs from selling their stock if they wished to do so. On the other hand, the Defendants presented evidence that the purpose of these amendments was to protect the S-Corporation status of RHC and LOR, and to keep assets, including Rollins Inc. stock, in the family, which the

30

jury could find to be legitimate goals exercised in the utmost good faith. Thus, a fact question remains and summary judgment was improperly granted as Gary's actions on this point.[15]

5. In the context of their enumerations and arguments related to the management of the family entities, the Plaintiffs also contend that the trial court erred in failing to find that the trustees breached their fiduciary duties when they replaced marketable securities in RCT with illiquid investments in debt-ridden entities created and controlled by Gary and Randall. The RCT Trust Indenture lists Gary, Randall, and Tippie as trustees. See *Rollins IV*, supra 168 (1) (b) (i).

Specifically, the Plaintiffs argue that in 2002, $150 million in liquid assets were transferred from RCT to RCT, LLC, a new entity controlled by Gary and Randall for the purpose of ensuring that Gary and Randall maintained control of all liquid marketable securities even after they were distributed to the beneficiaries. They argue that marketable stock was replaced with partnership interests that hold only the right to receive debt payments from the Plaintiffs themselves through their S-Trusts.

---

[15] The Defendants point out that three of the four Plaintiffs, Glen, Ellen, and Nancy Rollins, signed the LOR amendment in their capacities as trustees for a separate trust. However, as they did not sign in their capacities as beneficiaries, we do not address this issue further.

They argue that Gary and Randall "locked up" Rollins, Inc. stock originally held in RCT by transferring it to entities they control.

The Plaintiffs argue that the trustees knew these restructurings would cause them each to lose more than $14.5 million in present-day value from their RCT interests. The Defendants point to record evidence that the Plaintiffs participated in the restructurings of which they now complain, and that the purpose of those transactions was to minimize tax liability to future generations. They have provided evidence that the estate tax burden on the fourth and fifth generations has been reduced from 50.23 percent to 1.88 percent, generating an estimated value of $58 million to the fourth generation (which includes the Plaintiffs' children) and $131 million to the fifth generation.

The RCT indenture provides in pertinent part[16] that

The Trustees shall pay over to any one or more of my said grandchildren [including the Plaintiffs in the instant case] a part, all or *none* of the net

_____

[16] The trust indenture provides for specific distributions of principal upon the beneficiaries reaching their 25th and 30th birthdays. The record shows that the Plaintiffs already had received those distributions by 2002, the time of the transaction of which they complain, though they argue that they received illiquid assets. The trust provides that a final distribution is to occur when the trust terminates on the date of death of the last grandchild who was living when the trust was created on February 1, 1968. This final contingency has yet to occur.

income from said trust as will be appropriate, in the *sole discretion* of my said Trustees for the comfortable support and maintenance or education of said grandchildren. The Trustees *need not apportion said income in equal amounts* to said grandchildren and *may refrain from paying any amounts whatsoever* to any of such grandchildren.

(Emphasis supplied.) The trustees also are authorized to sell, convey, or dispose of any trust property, and the power to sell or retain stocks or other properties. The indenture gives the trustees the "power to do all things which may be necessary or proper to protect and preserve the trust estate" and to do "any and all things in connection with such transactions as could be done by the Trustees if they owned the trust property in their own right and for their own benefit." Further, the trust provides that in distributing income, "[t]ax factors may also be taken into consideration by the Trustees to the end that Donor's *family as a whole* shall be subjected to the least practicable income and estate taxation." (Emphasis supplied.)

This last provision, authorizing the trustees to make management decisions based on tax considerations for the entire Rollins family – not just the Plaintiffs – when coupled with the trustees' broad authority as granted in the indenture, negates any possible fact question that could have arisen between the Plaintiffs' contention that they lost present-day value in their RCT assets, and the Defendants' showing of

33

significant tax savings to present and future generations. See generally *Meyer v. Citizens and Southern Nat. Bank*, 677 F.Supp. 1196, 1202 (II) (B) (1) (M.D. Ga. 1988) ("The fact that losses were suffered does not prohibit a court from approving the actions of a trustee") (citation omitted.)[17]

Trustees, of course, must administer a trust "in good faith, in accordance with its provisions and purposes." OCGA § 53-12-240 (b). They also must "exercise the judgment and care of a prudent person acting in a like capacity and familiar with such matters, considering the purposes, provisions, distribution requirements, and other circumstances of the trust." OCGA § 53-12-241. Given the broad powers granted to the trustees as shown by the trust instrument, as cited above, and the clear intent of the Settlor as shown by that trust instrument, see *Griffith v. First Nat. Bank & Trust Co.*, 249 Ga. 143, 146 (1) (287 SE2d 526) (1982), no fact question arises as to whether the trustees' actions were consistent with the authority granted to them in the RCT indenture. Nor is there any fact question as to their good faith, again in the

---

[17] As the Defendants point out, there is evidence that the Plaintiffs actually participated in transactions about which they now complain, whereby certain partnership interests held in the RCT were transferred to family entities, specifically, RCT, LLC, and RCTLOR, LLC. We note that beneficiaries may be estopped from complaining about alterations to which they agreed. See *Clayton v. First Nat. Bank of Atlanta*, 237 Ga. 604, 604 (229 SE2d 346) (1976).

34

context of the latitude of their authority under the indenture.[18] The trial court did not err.

6. The Plaintiffs now argue that Gary and Randall also committed constructive fraud and are liable for amending the RIF partnership agreement without their knowledge or participation, and for suppressing material facts. See *Rollins IV*, supra at 172-173 (1) (c) (ii). The Plaintiffs did not argue this point in their initial appellate brief, so we do not address it here. See *Blockum*, supra at 592 (1).

7. The Plaintiffs argue that, other than giving them an accounting of trust assets, the trial court erred in granting summary judgment to the Defendants on the other aspects of the Plaintiffs' breach of trust claims. The Plaintiffs initially had sought, inter alia, rescission, removal of the trustees, and appointment of a receiver. Given our determinations in the instant opinion that certain fact questions remain for jury resolution, the trial court would need to reassess these issues in light of a jury's determination as to whether or not Gary and Randall acted in good faith or breached

---

[18] The Plaintiffs' argument that Gary and Randall's actions were inappropriate because the third trustee, Tippie, was not involved in management decisions made at the entity level does not succeed. The record shows that Tippie participated in the vote to put RCT assets into RCT, LLC, and we find no requirement in the trust indenture that all three trustees be involved in or make unanimous decisions related to assets held within corporate entities held within the trust.

their fiduciary duties or duties of trust. As a result, we remand these matters to the trial court.[19]

8. The Plaintiffs also argue that Gary and Randall breached their fiduciary duties as trustees in seeking to implement the Rollins Perpetual Management Trust, which was intended "to serve as the vehicle through which the governance of the family and its assets is established in perpetuity." However, as the Plaintiffs acknowledge that they refused to sign the documents to implement this trust, we find no breach of fiduciary duty. The trial court did not err.

9. On remand, the Plaintiffs argue that Gary violated his trustee-level fiduciary duties by failing to "generate income" for the S-Trusts.

Although the parties argued this point on summary judgment, the trial court ruled on the issue only in the context of how trust income was classified. The trial court found that because the S-Trust indenture gave the trustees the authority to classify money as either income or principal, the trustees had no duty to "maximize" the income distributions and had breached no duty. Because the trust indenture gives

---

[19] We recognize that our decision herein is different from the decision on this point in *Rollins I*. However, in footnote 8 of *Rollins IV*, supra at 166, the Supreme Court concluded we had chosen in *Rollins III* to reconsider our previous opinion in its entirety upon remand, and further, the Supreme Court in *Rollins IV* vacated our opinion in its entirety.

the trustees the discretion to determine whether items should be charged or credited to income or principal, the trial court's decision on this point was correct.

In the context of pure income generation, however, the trial court made no ruling on whether the Defendants had a duty to maximize earnings or to generate funds for the S-Trusts (regardless of whether those monies were later classified as income or principal), or on whether the Defendants had breached any duty in this regard. As a result, we remand this issue to the trial court for further consideration.

10. Finally, the Plaintiffs argue that the trial court erred in failing to order a judicial or third-party accounting and an accounting of the business entities held within the trusts and controlled by the trustees.

> Trusts are peculiarly subjects of equity jurisdiction. OCGA § 53-12-6 (a). Thus, in determining whether a trustee's accounting is sufficient under a given set of circumstances, an appellate court must consider whether a trial court properly exercised its equitable discretion; and the decision of the trial court should be sustained where such discretion has not been abused. See *Prime Bank v. Galler*, 263 Ga. 286, 288 (4) (430 SE2d 735) (1993); *Estate of Hershel*, 336 P.2d 571 (168 Cal.App.2d 658) (1959) (whether trustee's account is sufficiently detailed is matter committed to sound discretion of trial court). See also OCGA § 53-12-243 (e) (Ga.L.2010, pp. 579, 611) ("Nothing in this Code section shall affect the power of a court to require or excuse an accounting").

(Punctuation omitted.) *Rollins II*, supra at 713 (1). The trial court denied the accounting request in the context of its decision denying the Plaintiffs' other claims on summary judgment. Given that our instant opinion has determined that some of those issues are appropriate for jury resolution, the trial court would need to exercise its discretion anew in light of the different circumstances now presented, and in light of a jury's decision on issues placed before them for resolution. We, thus, vacate the trial court's decision on the accounting issue and remand for further consideration in light of any subsequent jury determination.

*Judgment affirmed in part, reversed in part, vacated in part, and case remanded. Branch, J., concurs. Miller, P. J., concurs in the judgment only*.