**FIFTH DIVISION
MCFADDEN, P. J.,
HODGES and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**June 20, 2025**

# In the Court of Appeals of Georgia

A25A0090. KENG et al. v. KENG.

MCFADDEN, Presiding Judge.

Appellants Leigh Keng and Natalie Keng challenge the grant of a defense motion for summary judgment on their claims seeking to invalidate amendments to a trust executed by their father, Edward Keng, and their father's widow, Susie Keng, and to have Susie Keng removed as trustee. Because the appellants have failed to identify any evidence giving rise to genuine issues of material fact on their claims to invalidate the trust amendments, we affirm the grant of summary judgment on those claims. But they have shown genuine issues of material fact on their claim to remove the trustee, so we reverse the grant of summary judgment on that claim.

1. *Facts and procedural posture*

In 2014, Susie and Edward Keng, who were married, executed a revocable living trust naming themselves as co-trustees. In 2016, they executed a first amendment of the trust. The first amended trust again named Susie and Edward Keng as co-trustees. It also identified their family as including their children from prior marriages — Susie Keng's child Michael Tien and Edward Keng's children Leigh, Natalie, and Pearl Keng. A provision of the first amendment provided that upon Edward Keng's death, the assets of a certain investment account would be distributed equally to Leigh, Natalie, and Pearl Keng. Under other provisions, upon the death of either spouse, all other trust assets were to go to the surviving spouse for life, with the remainder going equally to all four of their children.

In November 2019, Edward Keng was diagnosed with pancreatic cancer. Thereafter, he distributed the assets in that investment account equally to his three daughters. In February 2020, Edward and Susie Keng executed a second amendment to their trust, removing the provision regarding distribution of that investment account. Edward Keng died approximately two months after the second amended trust had been executed, leaving Susie Keng as the sole trustee.

Two of Edward Keng's daughters, Leigh and Natalie Keng, filed a complaint against Susie Keng, seeking to set aside both the 2016 and 2020 amendments to the trust based on Edward Keng's alleged lack of capacity and Susie Keng's alleged undue influence, and seeking to have Susie Keng removed as trustee due to alleged unfitness. Susie Keng moved for summary judgment on all claims. After a hearing, the trial court granted the motion for summary judgment, finding that there were no genuine issues of material fact as to Edward Keng's capacity, Susie Keng's undue influence, or Susie Keng's unfitness to serve as trustee. This appeal followed.

2. *Summary judgment standards*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law[.]" OCGA § 9-11-56 (c).

> A defendant [moving for summary judgment] may demonstrate that [s]he is entitled to summary judgment by either presenting evidence negating an essential element of the plaintiff[s'] claims or establishing from the record an absence of evidence to support such claims. Once the defendant has met this burden, the plaintiff[s] must point to specific evidence giving rise to a triable issue or suffer summary judgment. Id.

3

*Griffin v. Turner*, 350 Ga. App. 694, 695 (1) (830 SE2d 239) (2019) (citations and punctuation omitted). See also *Cowart v. Widener*, 287 Ga. 622, 623 (1) (a) (697 SE2d 779) (2010). "We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant." *Sorrow v. 380 Properties*, 354 Ga. App. 118, 120 (840 SE2d 470) (2020) (citation and punctuation omitted).

3. *Amendments to the trust*

Appellants argue that the trial court erred in granting summary judgment on their claims to set aside both trust amendments because there are genuine issues of material fact as to Edward Keng's lack of capacity and Susie Keng's exercise of undue influence. See *Slosberg v. Giller*, 314 Ga. 89, 96 (2) (b) (876 SE2d 228) (2022) (the valid formation of a trust instrument may be challenged for, among other things, lack of capacity and undue influence). We disagree.

(a) *Lack of capacity*

> "A person has the capacity to create an inter vivos trust to the extent that such person has the legal capacity to transfer title to property inter vivos." OCGA § 53-12-23. A [trust] may be deemed invalid and cancelled in equity on the ground of mental incapacity if the grantor is shown to be entirely without understanding of the [trust] at the time of execution. . . . [W]eakness of mind not amounting to imbecility is not sufficient mental incapacity to justify setting a [trust] aside.

4

*Mullis v. Welch*, 346 Ga. App. 795, 798 (2) (a) (815 SE2d 282) (2018) (citations and punctuation omitted). "[T]he burden is on the party attacking a [trust] to show the incompetency of the signer at the time of the execution thereof." *Armour v. Peek*, 271 Ga. 202, 203 (2) (517 SE2d 527) (1999) (citation omitted).

In moving for summary judgment, Susie Keng presented evidence that at the time Edward Keng executed the 2016 and 2020 amendments, he had the capacity to do so. Chris Miller, the estate planning attorney who prepared the amendments, testified by affidavit that Edward Keng was intelligent and highly educated; that he was engaging, well-spoken, and composed when they met; that he was familiar with his assets and who he wanted to benefit from the amended trusts; that both amendments were drafted in accordance with Edward Keng's express wishes; that on the dates the amendments were executed, Edward Keng was alert and completely knowledgeable about the documents and his intentions, he did not appear to be under the influence of alcohol or any other substance, he reviewed the amendments thoroughly, and he clearly understood their contents before signing them.

Miller's partner, Marianna Chaet, who helped with the first amendment and was present when it was executed, also testified by affidavit that Edward Keng was

engaging, alert, knowledgeable and in complete control of his faculties when he came in to execute the amendment. She observed nothing in his words or behavior to suggest that he was forgetful, confused, or unable to fully understand what was going on around him. She had no doubt that Edward Keng understood what he was signing, and she would not have allowed him to sign the document if there were any concern that he lacked the requisite capacity.

Edward Keng's daughter Pearl Keng swore in an affidavit that he was an astute businessman, detail-oriented, and an accomplished scientist and inventor. Pearl Keng testified that she visited him shortly before he signed the first amendment to the trust; that he was sharp, engaged, and astute as he had always been; and that it was clear from their conversations that he knew the nature of his extensive assets. She also testified that he remained alert, witty, and sharp until the last couple days of his life; that they had countless conversations in the final months of his life and it was obvious that he knew exactly what property he owned and what he wanted to do with it; and that the first and second amendments to the trust entirely reflect his wishes regarding the disposition of his assets.

Edward Keng's sister stated in an affidavit that she visited him during the month before he executed the second amendment. She testified that during that visit, Edward Keng was as alert, engaged, sharp, and witty as he had always been. She also stated that he had a great memory and that had not changed at all.

Given such evidence of Edward Keng's mental capacity, Leigh and Natalie Keng must point to specific evidence giving rise to a triable issue as to whether Edward Keng lacked capacity when he executed the trust amendments. See *Cowart*, supra; *Griffin*, supra; *Creamer v. Manley*, 371 Ga. App. 134, 135 (1) (899 SE2d 776) (2024) (to avoid summary judgment, nonmovant must show that a genuine issue of material fact remains on the question of mental capacity). With regard to the first amendment, they point to evidence purportedly showing that Edward Keng did not know what assets he owned. But the evidence they cite "falls well short of demonstrating the lack of [mental] capacity." *Singelman v. Singelmann*, 273 Ga. 894, 897 (1) (548 SE2d 343) (2001).

Leigh and Natalie Keng first cite evidence that over a year before the first amendment was executed, Edward Keng met with an attorney, whom he did not retain, and provided documents detailing some of his assets, but said there were other

assets for which he had not brought documentation. He also said he was unclear which properties were listed in only his name, jointly with his wife, or in her name only, explaining that title changes had been made for tax purposes.

They also point to evidence that at the initial meeting with attorney Miller, who prepared the trust amendments, Edward Keng brought a copy of the 2014 trust to be amended, but no other documents. They also point to Miller's deposition testimony that he recalled discussing three properties with Edward Keng, but could not recall if they discussed additional real property.

Contrary to the appellants' claim, it is not a reasonable inference from the evidence they cite that Edward Keng did not have sufficient knowledge of what assets he owned, let alone lacked mental capacity, when he executed the first amendment. The facts that Edward Keng brought only a copy of the trust to be amended to his initial meeting with his attorney and that the attorney could not recall all the property that was discussed, that Edward Keng provided documentation of only some of his assets to another attorney whom he did not hire more than a year before the amendment, and that at that time Edward Keng did not know the exact listings of all his properties "does [not] establish [mental] incapacity as of the date of the execution

8

of the [first amendment]." *Ashford v. Van Horne*, 276 Ga. 636, 638 (1) (580 SE2d 201) (2003) (evidence that testator was mistaken about beneficiaries under insurance policies did not raise a genuine issue of material fact as to mental capacity). See also *Webb v. Reeves*, 299 Ga. 760, 761 (791 SE2d 35) (2016) ("standard for testamentary capacity does not require the testator to know the precise property holdings of which his estate consists, only that he be capable of remembering generally what property is subject to the wills disposition") (citation and punctuation omitted); *Singelman*, supra (evidence that testator did not know his exact assets and income did not demonstrate lack of mental capacity). Indeed, Natalie Keng herself deposed that she was at Edward Keng's meeting with the attorney whom he did not hire, and that at that time Edward "was not cognitively inept" or "completely unaware."

As for the second amendment, Leigh and Natalie Keng cite evidence that Edward Keng was weakened from his illness and had been in home hospice with fevers and chills prior to executing that amendment. But "[e]vidence that [Edward Keng] was . . . ill and in pain when he executed [the second amendment] or that his medical condition [had] deteriorated . . . does not show lack of [mental] capacity to make [the second amended trust]." *Prine v. Blanton*, 290 Ga. 307, 310 (1) (720 SE2d 600)

9

(2012). See also *Creamer*, supra at 137 (1) (mental capacity may be possessed by weak-minded or feeble individuals).

They also point to Leigh Keng's deposition testimony that Edward Keng called her after executing the second amendment and said that he was "distraught and unhappy" and said it was "too late." While such evidence may support an inference about Edward Keng's purported dissatisfaction with the second amendment, it does not show a lack of mental capacity at the time he executed it. Leigh Keng's "statements that [Edward Keng] was . . . upset . . . are not sufficient to demonstrate the entire lack of understanding at the time of [his] execution of the [second] trust[ amendment] . . . that is required to invalidate [that] document[]." *Mullis*, supra at 800-801 (2) (c) (affirming grant of summary judgment to trustees on plaintiff's claim that grantor of trust lacked mental capacity to execute trust agreement).

Based on the evidence cited by the parties, "[e]ven when construing [it] in the light most favorable to the appellants, they have not presented a genuine issue of material fact that [Edward Keng] lacked the requisite mental capacity when [he] signed [the amendments to the trust]." *Creamer*, supra at 137 (1). The trial court therefore did not err in granting summary judgment on this ground.

(b) *Undue influence*

"Generally, the question of undue influence is for the factfinder. Undue influence may be shown by circumstantial evidence as well as by direct evidence, and slight evidence of fraud and undue influence may authorize the jury to cancel the [trust]." *Estate of Butler v. Patterson*, 373 Ga. App. 475, 478 (907 SE2d 200) (2024) (citations and punctuation omitted).

> For undue influence to be sufficient to invalidate a trust, it must amount to deception or force and coercion so that the grantor is deprived of free agency and the will of another is substituted for that of the grantor. It is not enough to show that there was an opportunity to exert influence coupled with a substantial benefit under the trust; actual deprivation of the grantor's free will is required.

*Lewis v. Van Anda*, 282 Ga. 763, 766 (4) (653 SE2d 708) (2007) (citations and punctuation omitted). See also *Slosberg*, supra at 97 (2) (b) ("Undue influence amounts to deception or force and coercion so that a person is deprived of free agency and the will of another is substituted for his.") (citation and punctuation omitted). "The improper influence must operate on the [grantor's] mind at the time the [trust] is executed." *Ashford*, supra at 638 (3) (citation and punctuation omitted).

In support of summary judgment, Susie Keng has cited evidence that Edward Keng was acting of his own free agency at the time he executed the trust amendments. Attorney Miller testified that he prepared the amendments with input and involvement only from Edward Keng, that the documents were drafted pursuant to Edward's instructions, that Edward Keng read the amendments carefully and stated that they accomplished what he wanted, that there was nothing to indicate the amendments were the product of undue influence from another person or that Edward was not signing them entirely of his own volition, that both amendments reflected solely Edward Keng's wishes exactly as he had conveyed them, and that the attorney had no doubt that Edward Keng signed them voluntarily. The attorney further swore that he would not have allowed Edward Keng to execute the documents if there were any doubts about him signing voluntarily.

Attorney Chaet, who was present at the execution of the first amendment, testified that, based on her interactions with Edward Keng and his statements about the amendment, she had no doubts that he understood what he was signing, that the document was exactly what he wanted, and that he signed it freely and voluntarily without influence or duress from anyone.

Pearl Keng swore in her affidavit that Edward Keng was strong-willed, assertive, and stubborn. Pearl Keng testified that Edward Keng was the person in charge of the family and that Susie Keng always deferred to his wishes. She further swore that Susie Keng stayed out of his business and financial affairs, that she was deferential to him, and that any suggestion she could have dictated his decisions is "ridiculous."

Conversely, Leigh and Natalie Keng claim there is evidence showing that Susie Keng unduly influenced Edward Keng when he executed each amendment. With regard to the 2016 amendment, they cite evidence that Susie Keng was angry when she learned that Edward Keng had met with an estate planning attorney without her knowledge; that she objected to another attorney he had used; and that Edward Keng then chose attorney Miller, whom Natalie Keng said he may have found through his investment advisor, to prepare the 2016 amendment. Leigh and Natalie Keng also cite evidence that Susie Keng yelled at Edward Keng and was upset when he did not follow a schedule, and that after one such incident Edward Keng told Leigh Keng to "let [Susie Keng] do what she wants." While the evidence shows that Susie Keng may have influenced which attorney they used, it does not show that Edward Keng was

actually deprived of his free will and that Susie Keng's will was substituted for his at the time he executed the first amendment to their trust. See *Ashford*, supra.

As for the second amendment, the appellants point to the circumstances that Edward Keng was 83 years old, had cancer, was in home hospice care, and later expressed regret. They cite *In re Estate of Henry*, 366 Ga. App. 638 (883 SE2d 855) (2023), as support for finding that these circumstances create a genuine issue of material fact about undue influence. But *Henry* is materially different because in that case there was evidence that the testator was confined to a wheelchair and that he changed his will because of fear for his own personal safety if he did not do so. Id. at 641 (1). In this case, while Edward Keng was elderly and in hospice care, there is no evidence that he executed the second amendment because he feared for his own safety. And any second thoughts about the document did "not demonstrate[] an issue of fact that at the time of execution of the [second amendment, Susie Keng] was exercising that degree of force or duress so as to destroy [Edward Keng's] free agency and substitute her will for his." *Pope v. McWilliams*, 280 Ga. 741, 745 (1) (632 SE2d 640) (2006) (affirming summary judgment and finding that sister's statements to

elderly, infirm brother that he had "to go make that will" were insufficient to show undue influence invalidating will).

4. *Removal of trustee*

Leigh and Natalie Keng contend that the trial court erred in granting summary judgment on their claim that Susie Keng should be removed as trustee. We agree.

"Georgia trust law requires trustees to 'administer the trusts solely in the interests of the beneficiaries,' OCGA § 53-12-246 (a), and imposes upon them a duty of impartiality[.]" *Rollins v. Rollins*, 338 Ga. App. 308, 313 (1) (a) (790 SE2d 157) (2016) (punctuation omitted). Under that duty,"a trustee shall administer a trust impartially based on what is fair and reasonable to all of the beneficiaries and with due regard to the respective interests of income beneficiaries and remainder beneficiaries." OCGA § 53-12-247.

> Beneficiaries of a trust are entitled to have it administered by trustees entirely at the service of the trust and above suspicion. The purpose of this rule is to require a trustee to maintain a position where [her] every act is above suspicion, and the trust estate, and it alone, can receive, not only [her] best services, but [her] unbiased and uninfluenced judgment. Whenever [she] acts otherwise, or when [she] has placed [herself] in a position that [her] personal interest has or may come in conflict with [her] duties as trustee, or the interests of the beneficiaries whom [she] represents, a court of equity never hesitates to remove [her].

15

*Clark v. Clark*, 167 Ga. 1, 5 (144 SE 787) (1928) (citation omitted).

Here, the appellants cite a message Susie Keng sent to Natalie Keng after Edward Keng's death. In the message, Susie Keng accused Natalie Keng of having hurt her father and stated: "This I will never forget nor forgive. . . . I can not forgive you." Susie Keng further wrote: "I know you hate me and I understand. . . . I will never forget. Please, I do not want to see you again. Do not try and reach out. . . that is what your father would want." Susie Keng concluded: "If you have any further questions regarding your rights . . . [p]lease contact my estate lawyer."

This evidence creates a genuine issue of material fact as to whether there are such irreconcilable differences and animosity between Susie Keng and Natalie Keng that Susie Keng cannot administer the trust impartially based on what is fair and reasonable toward Natalie Keng as a beneficiary. See *In re Estate of Jeffcoat*, 361 Ga. App. 828, 829 (2) (865 S.2d 661) (2021) ("irreconcilable differences and animosity, between a nominated executor on the one hand and the beneficiaries on the other, authorize but do not require the probate court's refusal to appoint the person nominated in the will as executor") (citation and punctuation omitted); *In re Estate of Hubert*, 325 Ga. App. 276, 287 (8) (750 SE2d 511) (2013) (evidence supported

probate court's finding of distrust among siblings who were co-executors and beneficiaries, and the decision to remove the parties as co-executors fell within the probate court's discretion).

> In determining whether a trustee should be removed the primary question is whether the trustee's continuance in office would be detrimental to the proper administration and best interests of the trust. . . . [T]he many possible grounds for the removal of a trustee [include] . . . [her] commission of breaches of trust or of conduct sufficient to show [her] unfitness to administer the trust. . . .

*Lovett v. Peavy*, 253 Ga. 79, 81 (2) (316 SE2d 754) (1984) (citations and punctuation omitted). Given the evidence of Susie Keng's animosity toward Natalie Keng, whether her continuance as trustee would be detrimental to the proper administration of the trust is a matter that cannot be resolved on summary judgment. So we reverse the trial court's grant of summary judgment on that ground, and need not address the appellants' additional grounds for challenging that ruling.

*Judgment affirmed in part and reversed in part. Hodges and Pipkin, JJ., concur.*